RECEIVED
03/27/2024
KELLY L. STEPHENS, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**SHAWN LIGGONS**                                    Cout of Appeals No. 23-3890

        Liggons' – Appellant

V.                                                                    Trial Court No. 3:20-cv-01208

GENERAL MOTORS, LLC; UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL INPLEMENT WORKERS OF AMERICA, LOCAL 14

        Defendants – Appellees

**On Appeal from the United States District Court
for the Northern District of Ohio
Case No. 3:20-cv-01208
Judge Jeffrey J. Helmick**

## <u>REPLY BRIEF OF APPELLANT SHAWN LIGGONS</u>

Shawn L. Liggons
7843 Rea Road, Apt. 177
Indianapolis, IN 46227
(419) 461-6576
Slliggons@yahoo.com
*Pro Se*, Liggons' – Appellant

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES.............................................................................. vi - v

JURISDICTION ……………………………………………………………… 1

FACTS ……………………………………………………………………...…… 1

INTRODUCTION ……………………………………………………..………. 2

STATEMENT OF FACTS ……………………………………………….… 3

    1. Attendance …………………………….…………………………… 3
        a. Shop Rule ………………………………………………… 3
        b. Doc. No. 8 ……………………………………………… 3, 4

    2. Raise ………………………………………………………… 7

    3. Demotion ……………………………………….....…….. 11

    4. Harassment ……………………………………...…………… 12

    5. Discipline ………………………………………………… 14

    6. Retaliation ………………………………………………… 15

    7. Termination …………………….…………………….……… 17

LEGAL STANDARD ……………………….....………………………… 18

LEGAL ARGUMENT ………………………………………….…………… 21

PRIMA FACIA ……………………………………………...………… 25
    1. Engaged in activity protected by Title VII …………………...…… 25
    2. The defendant knew the exercise of such protected activity …….…... 25
    3. Took an action that was "materially adverse." …………………… 26
    4. A causal connection existed ………………………….……… 27

CONCLUSION ..................................................... 28

CERTIFICATE OF COMPLIANCE .................................... 30

CERTIFICATE OF SERVICE …………………………………….………… 31

DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS ………………………………………… 32

APPEAL EXIHIBITS …………………………………………………... 35

# <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                          **Page(s)**

Abner J. Morgan, Jr. v. Natl. Rail. Pass. Corp., Dba Amtrak,
232 F.3d 1008 (9th Cir. 2000) …………….……………………………….… 22

Abbott v. Crown Motor Co., Inc.,
348 F.3d 537, 542 (6th Cir. 2003) …………………………………………… 25

Burlington N. & Santa Fe Ry. v. White (2006)
548 U.S. 53, 126 S. Ct. 2405 (2006) ……………………….….…………… 15, 25

Cruz v. Coach Stores, Inc, 202 F.3d 560, 566 (2d Cir. 2000) …………………... 21

DeCoe v. General Motors Corp.,
32 F.3d 212, 216 (6th Cir. 1994) ……………………………………………... 19

DelCostello v. International Brotherhood of Teamsters,
462 U.S. 151, 164 (1983) ……………………….….…………………………… 19, 22

Dougherty v. Parsec, Inc., 872 F.2d 766, 770 (6th Cir. 1989) …………..………. 25

Gordan v. Schilling, 937 F.3d 348, 356(4th Cir. 2019) …………………………..… 3

Kinds v. Ohio Bell Telephone Company (2013.) ………………………………….. 23

Laster v. City of Kalamazoo, 746 F.3d 714, 719 (6th Cir. 2014) ……………….. 24

Lingle v. Norge Div. of Magic Chef, Inc.,
486 U.S. 399, 405-06 (1988) …..………………….…………….….…………… 18, 20

Martin v. Lake CV. Sewer Co., Inc.,
269 F.3d 673, 679 (6th Cir. 2001) …………………………………………… 22

Mattis v. Massman, 355 F.3d 902, 906 (6th Cir. 2004) ………………………… 19

Montell v. Diversified Clinical Services,
757 F.3d 497, 505 (6th Cir.2014) ……………………………………….……… 28

University of Texas Southwestern Medical Ctr. v. Nassar,
No. 12-484 (June 24, 2013) ……………………………………….……  21

Wheat v. Fifth Third Bank, 785 F.3d 230, 237 (6th Cir. 2015) ……………….  22

**Statutes & Authorities:**

5 CFR 532.501 ………………………………………………………  5

28 U.S.C. § 133 ……………………………………………….…  1

28 U.S.C. § 1291 ……………………………………………………  1

29 CFR 778.105 …………………………………………………  6

29 U.S.C. § 2612(a)(1)(D) ……………………………………………  23

29 U.S.C. § 2614(a)(1)-(2) …………………………………………...  23

42 U.S.C. Sections 12101 et seq…………………………………………  2

42 U.S.C. Section 1981. …………………………………………………..  2

42 U.S.C. Sections 2000e et seq. …………………………………………  2

42 USC 2000e-2(c)(1) ……………………………………………  20

42 U.S.C.S. § 2000e-3(a) ……………………………………………  15

Fed. R. App. P. 32(a)(6) ……………………………………………  30

Fed. R. App. P. 32(a)(7)(B) ……………………………………………...  30

Fed. R. Civ. P.56(a) …………………………………………………  3

LMRA § 301 …………...……………………………...………  22, 23

Ohio Rev. Code§ 1.44(A) …………………………………………...  6

Ohio R. Evid. 901 (A) …………………….……….…………………  8, 17

Title VII of the Civil Rights Act of 1964 …………………………………… 20, 21

**Other Authorities:**

Continuous Violation Doctrine ……………………………………………. 22

## Jurisdiction

Pursuant to 28 U.S.C. § 133, Liggons incorporates the Jurisdiction Statement appearing at page 4 of his Opening Brief.  Pursuant to 28 U.S.C. § 1291, this Court has Jurisdiction over Liggons' Appeal.

## Facts

Liggons' incorporates the Facts that appear on pages 4-5 of his Opening Brief.

## **INTRODUCTION**

This Case originated IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO WESTERN DIVISION, Lucas County, Ohio.  The Liggons' brought a discrimination claim against Defendant GENERAL MOTORS, LLC. (GM) and Defendant UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL INPLEMENT WORKERS OF AMERICA, LOCAL 14 (UAW or Union) on June 2, 2020.

A. FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS - Racial Discrimination-Title VII 42 U.S.C. Sections 2000e et seq.
B. SECOND CLAIM FOR RELIEF - Racial Discrimination 42 U.S.C. Section 1981.
C. THIRD CLAIM FOR RELIEF - Americans with Disabilities Act 42 U.S.C. Sections 12101 et seq.
D. FOURTH CLAIM FOR RELIEF - Retaliation.

Liggons' is an African American citizen of the United States.  Liggons' has been employed with the Defendant Company General Motors since February 29, 2016, most recently as a Quality Operator.  Liggons' employment was terminated from GM on January 7, 2021.

Defendants General Motors, LLC ("GM") and United Automobile, Aerospace and Agricultural Implement Workers of America, Local 14 (the "Union" or "UAW") seek summary judgment on Liggons' Shawn Liggons' claim of retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (RE 42 and 43).  Liggons' filed briefs in response to

Defendants' motions. (RE 50 and 55).  Defendants filed briefs in reply. (RE 53, 54, 59, and 60).

## **STATEMENT OF THE FACTS**

### 1.  **Attendance**

GM claimed that Liggons' had an attendance problem.  Between June 2016 and April of 2019, Liggons' had 6 recordable attendance instances in a 33-month period (approximately 1000 days).  One was the result of death in family, one was due to an illness covered by FMLA, one was due to severe weather and the last one ("GM" turned one event into two events) was because Liggons' was dealing with mental and emotional issues.

While both Defendants would like you to believe that attendance was the problem, when actually "GM" assessment of discipline was the primary cause of the problem.

A party seeking Summary Judgment must show "that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56(a).  The court is "obliged to view the facts and inferences reasonably drawn therefrom in the light most favorable to the non-movant party." Gordan v. Schilling, 937 F.3d 348, 356(4th Cir. 2019) (quotation omitted).

The discipline GM issued to Liggons' for violating Shop Rule 9 was separate from discipline it issued for violating Doc. 8.

## a. **Shop Rule #9**

On January 12, 2018, Liggons' reported to work late, but less than 4 hours late, due to inclement weather.  GM issued Liggons' a 30-day suspension for violating Shop Rule 9.  However, Liggons' had all available vacation days and Liggons' timecard shows that Liggons' called his tardiness in once his transportation broke down (The City Bus).  Furthermore, Liggons was charged vacation time for the time he was late, paid and suspended for the same event. (RE 40, PageID 637, Appeal Exhibit A, B.)

There are only four relevant questions;  1.)  Was the weather inclement on January 12, 2018.  2.)  Was the Liggons' the only employee late on that date?[1]  3.)  Did GM suspend every employee that was late on that date?  4.)  Liggons' had no discipline actions from November 2016 until January 2018 (well over a year), so was a 30-day suspension appropriate?[2]

## b. **Doc. 8**[3]

On June 29, 2016, Liggons' did in fact call into work 30 minutes prior to the start of his shift.  GM has a record of all calls made to the call-in line (800-222-8889).  Even if you took into consideration the July 4th Holiday (Monday that year), GM disciplined Liggons' over 10 days later.  Furthermore, Liggons" was charged a vacation day (Liggons' used a [VR] Vacation Restriction Day (.*Id*) and was paid and written-up for the same event.

---

[1] GMs response to the Ohio Civil Rights Commission was that exactly 20 employees were late for work that day.  Ten Black employees and Ten White employees.  On March 29, 2018, two Caucasians employees; Ryan Palmer claimed he had experienced a flat time while at lunch and he never returned to work that evening, while on the same evening Ashley Hollerbach returned over 30 minutes late from lunch intoxicated.  Neither employee faced any type of discipline.

[2] GM claimed that they revised the suspension to 14-Days, however, pay records for that month will show that Liggons' did not return to work until February 2018.

[3] This procedure is separate and distinct from the plant's standard corrective disciplinary procedures.  All instances of employee absence, except the excludable absences as defined in paragraph 5, will be addressed through this procedure.

4

On September 30, Liggons' called in for an FMLA excused absence. GM has a record of that call as well. Both Defendants were aware of the FMLA excused absence, yet the Union allowed GM to administrate discipline over 45 days later on November 17, 2016.

On August 16, 2017, Liggons' was absence due to a death in the family. Liggons' did not have any vacation days available to use. Again, the Union allowed the GM to administer discipline 12 days later. Further, Liggons' received a 7-Day suspension masquerading as a week suspension. Liggons' was suspended Thursday, Friday, Monday, Tuesday, Wednesday, Thursday, and Friday although the Doc. 8 policy called for a 1-week suspension. (RE 39, PageID 424, RE 48-34, 36.)

On April 10, 2019, Liggons' was given back-to-back suspension of 2-weeks and 30-days according to Doc. 8 steps 4 and 5. (*Id*.). However, Liggons' timecard for week ending 04-07-2019 shows that Liggons' had available vacation time of 52 hours, yet 24 hours of vacation was denied by GM. The timecard also shows that Liggons' called in every day that week to the call-in line. (RE 49-13, Appeal Exhibit C, D.)

On August 21, 2017, Liggons' wrote a letter to Robin Marr (RE 49-10) stating that he disagreed with how his Doc. 8 penalty was administered because he was denied the opportunity to file a grievance. Paragraph 3 of Memorandum Of Understanding – Special Procedures for attendance states the that;

**"Grievances filed in regards to this Special Procedure will be initiated at the Second Step and <u>shall be strictly limited in scope to claims that the procedure was improperly administered</u>."**

According to 5 CFR 532.501 an Administrative workweek is **7 consecutive calendar days and** a Basic workweek for full-time employees means the days and hours within an **administrative workweek** which make up the employee's

regularly scheduled **40-hour workweek.** Additionally, 29 CFR 778.105 determines that an employee's workweek is a fixed and regularly recurring period of 168 hours—seven consecutive 24-hour periods. It need not coincide with the calendar week but may begin on any day and at any hour of the day. Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked by him. This is consistent with Ohio Rev. Code§ 1.44(A) which states that a "Week" means 7 consecutive days and a "Year" means 12 consecutive months.

On the April 10, 2019, back-to-back suspension, Union still refused to allow Liggons' to file a grievance. Liggons' had available vacation time and called in according to call in procedures, yet GM denied Liggons' available vacation and suspended Liggons' from 04-10-2019 until 05-31-2019. (RE 49-6.)

GM fail to acknowledge that Liggons' time on record was greater than 18 months (20 Months). (RE 39, PageID 424.) Furthermore, all other absences qualified per paragraph 5 under Doc. No. 8 (*Id*. At 420-421), therefore cannot be extended by periods of leave.

Liggons filed a complaint with Ohio Civil Rights Commission (OCRC) on April 30, 2018. (*Id.* at 372.)

2. **Raise**

On June 2, 2016, Liggons' was hired as an **"IN-PROGRESSION"**
employee with a starting pay rate of no less than $17.00 per hour with pay
progression and benefits for In-Progression employees covered in the 2015 GM-
UAW National Agreement. (RE 39, PageID 399.)  Liggons' anticipated an annual
raise as set forth in the collective bargaining agreement ("CBA"). (RE 41-1, RE
49-34.)

On March 6, 2017, Liggons' received a raise as anticipated.  However,
Liggons' did not receive his next raise until May 14, 2018, which should have
come in March of 2018.  Furthermore, Liggons' did not receive his 2019 raise until
September 29, 2020 (777 days later).  Liggons' filed two grievances (April 24,
2018 & March 12, 2019) regarding his annual raise.

Liggons' went 2 years (05/14/2018 until 06/29/2020) without a wage
increase. With the exception of 2018 and 2019 expected wage increase, Liggons'
has never gone a period of 12 months or longer without a wage increase as an
employee or as a temporary employee. (RE 49-47.)  GM, through its own
admissions shows that prior to 2018, Liggons' had never received a pay increase
greater than one year (12 months) (RE 41-3.)

During the course of time between April 2018 and January 2021, Liggons'
made several dozen attempts to rectify his raise issues.  Liggons' has written letters

to Jeff King and Mike Greason (RE 49-8, 21, 22.)  Liggons' also filed complaints

with the Ohio Civil Rights Commission (OCRC) (RE 49-24, 25, 26) and The

National Labor Relationship Board (NLRB) (RE 49-4, 5, Appeal Exhibit H, I)

regarding his pay issues.

Sometime between May 9 and May 20, 2019, Liggons' spoke with Chad

Cattell of the UAW region 2B office, Chad spoke of an "MOU", but refused to

provide Liggons' with a copy. (RE 41-2.)[4]

**Note:  Liggons filed grievance D 09040 on April 24, 2018, and
grievance D 09092 on March 12, 2019.**

On August 4, 2020, the NLRB conditionally dismissed the claim stating that

Liggons' "ultimately received" a copy of the "MOU". (RE 49-4 p. 2.)

Additionally, Liggons' had no knowledge that grievance D 09040 & D

09092 (RE 49-1)[5] were allegedly settled prior to Liggons' deposition on July 19,

2022. (RE 39, PageID 339-342.)

Both Defendants claim that Liggons' was subject to paragraph 98 and 99 of

the National Agreement clearly stating that:

*** Grievance has not met the requirements to satisfy para. 98 & 99 of the
National Agreement."***

---

[4] Defendant introduced this document sometime after April 2019 but failed to
disclose the birth of this document and where this document resides. Liggons'
objects to this document entirely pursuant to Ohio R. Evid. 901 (A).
[5] Liggons' presented these 2 grievances to the OCRC, and they were stamped
received on May 7, 2019, by OCRC.

Taking a closer look at paragraph 98 and 99[6] of the National Agreement,

Defendants shows an elevated level of intentional deception because Liggons'

could never be mistaken as an "Traditional Employee." (RE 39 PageId 399, RE 41-

1, RE 49-3, 5, 12, 34, 35, Appeal Exhibit F, H, I.)

Although the memorandum defines what "weeks worked" is, the UAW and

GM's Memorandum of Understanding Re: Calculation of Wage Progression that

was allegedly signed and produced on March 4, 2016, does not indicate what form

of calculation is measured (i.e., 26, 52, 78 "weeks worked" as it did in the 2011

CBA.)  Secondly, it shows no correlation to the Memorandum of Understanding

UAW-GM Wage and benefits agreement for employees in-progression since that

document does not indicate or use either phrase "weeks worked" or "52 weeks", it

just simply uses the phrase "12 Months."  Furthermore, the first paragraph of the

document states that:

**"This Memorandum confirms the understanding between the parties
with respect to the calculation of wage progression for employees, regular
active and temporary, hired after the effective date of the 2015 National
Agreement."**

Liggons' contends that there is only one true question.  Was Liggons an employee

in progression or a regular/traditional employee according to paragraph 98 of the

2015 National Agreement? (RE 39, PageId 298-399.)

---

[6] Paragraph 99 is inconsequential as it relates to Performance Bonus only, which all
full-time employees are eligible to receive.

Therefore, neither Defendants can use this as a bases for contentious. (RE 41-1, RE 41-2.)  Both Defendants have yet to authenticate and manifest this "MOU" Re: Calculation of Wage Progression existence other than it just showing up one day.  This is one of two arguments that both Defendants are unable to provide a documental trail, even if they try to equate this one to the language in the 2011 CBA, they will still fail in context alone, making it unenforceable.

Lastly, Liggons' has provided several letters to the UAW, OCRC and NLRB as recently as September 2020 regarding his raise issues and requesting that the two grievances in question be resolved.  However, neither Defendants can provide any documentation other than GM's Defense Exhibit CC, which was show to Liggons' on July 19, 2022, during his deposition (RE 39 PageID 338-342, 477-478.), that either of these grievances had been settled.

Liggons' filed complaints with OCRC on March 14, 2019. (RE 39 PagelD 375) Liggons' also filed complaint with NLRB on August 27, 2018 (*Id.* At 394) and again on September 20, 2019 (RE 49-5) for failure to honor pay increases per language in the "CBA". C)   Liggons' did not file a complaint against GM in 2018 with OCRC, but in fact filed a complaint with the NLRB.  In 2019 Liggons' filed complaints with both OCRC & NLRB regarding unresolved pay grievances.

### 3. <u>Demotion</u>

Liggons' suffered a demotion from Team Leader position in 2020.  Liggons' started training for Team Leader position in his department between October and November 2019.  On December 10, 2019, Liggons' took the team leader test and scored a 90% over the 80% required passing score.  Liggons' was given confirmation on passing from test administered by Jim Honaker.  On February 10, 2020, Liggons started his 3-day team leader training class.  Honaker proceeded with processing all necessary requests to allow Liggons' computer access for official Team Leader responsibilities. (RE 49-48.)

Liggons' was questioned about passing the Team Leader test in December of 2019. Liggons' dismissed the allegations of not passing with Bridgette Cole, after nothing else was said about the test.  In February 2020, Liggons' attended the 3-day GMS (Team Leader) training class. (RE 49-18 @ 3.)  Liggons' continued to train for Team Leader until May 20, 2020, also receiving $1 per hour increase for Team Leaders pay.

Liggons' was told in June 2020 that he could not be Team Leader because the Team Leader test had 2 math questions and Liggons' answered one of the math questions wrong which resulted in an automatic failure.  Liggons' filed an ethics complaint on June 28, 2020.  GM interviewed Liggons' regarding ethics complaints on July 10, 2020, and followed up on July 24, 2020. (RE 49-17, 49-40.)

Liggons' objected to GMs' internal investigation into the matter.  Liggons' also filed grievance D 09203 on July 12, 2020.  Brandy, a Caucasian female from a different department on the other side of the plants started working as Team Leader on her days off, Liggons' would be asked to work as Team Leader when no-one else would be available.  GM affirmed that no such language existed in regards to missing one out of two math questions would result in an automatic failure of the Team Leader test. (RE 49-40.)  GM further states that Liggons' has a combined score of "59", even though GM offers two categories of improvement in scores, GM fails to give a total account of Liggons's score. (*Id.* at 3, 10.)

### 4.  **Harassment**

Liggons' faced harassment on June 25, 2019, from Vanessa Hamilton, Robin Marr, and Peggy McKnight. (RE 49-19.)  After reporting the harassment, Liggons' went to medical to get out of harm's way, Liggons' was suspended for 2 weeks immediately afterwards. (RE 49-49 @ 2.)

Liggons recorded his disciplinary interview.  During the interview, after acknowledging that Liggons' told Paulson that he was being harassed, Paulson says that this is not about that, "this about you going to medical without a medical pass."  GM ignored Liggons' cry for help when Liggons' brought the situation up to management.  Mike Paulson, upon Liggons' making his complaint received a phone and left immediately.  Liggons' with tears in his eyes did not sway Paulson

at all.  Liggons's feeling hopeless in his situation went to medical where Marsha

White, the on-duty nurse, allowed Liggons' to come in and gain his composure,

knowing that he did not have a medical pass.  When Liggons' left medical he went

directly to Paulson.  Paulson immediately put Liggons on notice and suspended

him for two weeks because he went to the medical office without a pass on his

break.  Liggons' also made his claim to Ron Holland, RWD Shift Manager, He did

not attempt to investigate my claims of harassment.

Furthermore, Liggons did not get a chance to file a grievance until July 12,

2019, after he returned from his suspension.  Management had made no effort to

investigate my claim of workplace harassment and hostile work environment.  In

fact, DeRonnie Turner did not interview Liggons' until July 16, 2019.

Liggons' was harassed by Jeff King on February 10, 2020. (RE 49-16.)

King claimed that Liggons' attempted to enter the plant on King's credential, which

is why he pushed Liggons' back and closed the door.  GM and the UAW failed to

recognize the proper procedure for entry into the facility at that location.  Turner

was only one to review the camera and Turner did not interview Liggons' until

September 14, 2020. (RE 49-42.)

Liggons' recorded that interview.  Liggons' has direct evidence that will

contradict Turners claim on when he reviewed the video tape.  Liggons held back

this evidence in fear of retribution from both Defendants.  Turner stated that he

13

watched the video tape of Liggons' entrance into the plant on February 10, 2020, and found Liggons' claims unsubstantiated. Turner goes on to say that he watched the video and interview Jeff King on February 11, 2020. With Liggons making the claim of harassment and signing a statement on the 10th, Liggons' should have been interviewed before King and even interviewed before viewing of the video tape. Turner had four days to interview Liggons' but refused not to interview him. If it were not for Liggons' sharing his disbelief to Letecia Pickens, Turner would not have even conducted his interview on September 14th.

### 5. Discipline

In 2016 Liggons' went from zero discipline in August 2016 to facing a 30-day suspension in November 2016. Liggons' vigorously pursue vindication over the 2016 discipline he received from the Defendant. Liggons' requested to meet with his UAW civil rights representative in August of 2016 but was not allowed to meet with them until December of 2016. Liggons' also pursued his right to appeal within Defendant UAW through the grievance process only to be met with hostility.

During the 138-day period from April 10, 2019, through August 26, 2019, Liggons' was suspended for 88 days. Comparable to the discipline Liggons' received in 2016, where Liggons' went from zero discipline to facing a 30-day suspension (on his next suspension) within a two-month period. In 2016, Liggons'

14

was suspended for not accepting the assistance from his union representative (RE 49-23), who Liggons' believed was the reason for his discipline. Liggons' was also suspended for going to medical and other accusations both Defendants claimed that they had written statements from other employees but did not have to produce them to Liggons'. That would, at worst, violate Liggons' "Due Process Rights."

Even if GMs' suspension of Liggons' was "JUST" on January 12, 2018, Liggons' had gone 14 months without any alleged incident. Furthermore, since Liggons' January 12, 2018, was not "Just", Liggons' record should have been cleared with no incidence from November 2016 through June 2019. This could be the said the same for Liggons' attendance which was without incidence for 20 months from August 2017 through April 2019. In fact, every suspension Liggons' received after January of 2018 was in excess of 2-weeks.

### 6. **Retaliation**

Defendants In the context of 42 U.S.C.S. § 2000e-3(a), a Plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means the anticipated adversity well might have dissuaded the employee from making or supporting a charge of discrimination. Burlington N. & Santa Fe Ry. v. White (2006) - 548 U.S. 53, 126 S. Ct. 2405 (2006).

During Liggons employment with GM, Liggons' protested every level of his discipline received. Liggons', during 2016, went from zero discipline to anticipating a 30- days suspension on his next alleged infraction. This was done within a two-month period. Liggons' initially pursued regress through remedies outlined throughout the "CBA" and with no avail Liggons' pursued other avenues to resolve actions taken against him. Liggons' was met immediately with animus. Liggons' took his concerns to the Ohio Civil Rights Commission and National Labor Relations Board after his failure with UAW.

Liggons' did not have any alleged shop rule discipline between January 12, 2018 and June 25, 2019 (529 days). Even Liggons' Doc. No. 8 (Attendance Improvement) had a gap of time from August 16, 2017 to April 10, 2019 (602 days). (RE 49-47)

In 2019 alone, Liggons' was suspended twice for 2-weeks and three times for 30-days. One suspension was due to Liggons' reporting that he was being harassed. The second harassment Liggons' received was in February 2020. Liggons' believes that is why he was demoted from his Team Leader Position. Finally, Liggons' did not receive a raise from May 14, 2018 until June 29, 2020 (25 months). Both Defendants had well over a year to produce the MOU RE: Calculating Wage Progression, especially since the alleged document was dated

16

March 4, 2016. (RE 41-2). However, Liggons' asserts that the document is immaterial.

### 7. <u>Termination</u>

Liggons' was terminated on January 7, 2021 for allegedly violating GM's alleged "Unauthorized Recording Policy." (RE 39, PageID 479, RE 48-3.)[7] GM argues that Liggons' admitted that he was "quite aware" of the policy, however Liggons' was only admitting to the policies in the GM Code of Conduct, Full Social Media Policy, Global Human Rights Policy, Global Integrity Policy, Code of Conflict and Code of Ethics. Which none of them refers to the alleged "Unauthorized Recording Policy." Secondly, GM only referenced the first part of Liggons' Deposition on that subject matter. Liggons' reaffirms that he has never seen that document before and has been unable to locate it since he first saw it on January 7, 2021. (RE 39, PageID)

The document Liggons' received lacked actuality in many respects, anyone can type words to a piece of paper and print it, yet GM provides this document with no hint to where and what 107 and 109 says, leaving this document immaterial.

---

[7] GM introduced this document on January 7, 2021, but failed to disclose the origins of this document and where this document resides. Liggons' objects to this document entirely pursuant to Ohio R. Evid. 901 (A).

Liggons' did not seek leave to amend his original compliant for 3 reasons;

First Liggons' believed that from conversations with his prior counsel that the

appeal process would take care of those issues.  Second Liggons' has continued to

seek counsel and take over this case in Liggons' behave, however Liggons' has not

been able to financially secure counsel.  Third, Liggons' hoped that both

Defendants would have settled by now, not understanding the legal process and its

complexity, which Liggons' lacks the experience.[8]

## LEGAL STANDARD

In evaluating whether claims will be preempted by the federal Labor

Management Relations Act (LMRA), the federal doctrinal principles emphasize

that claims must be independent of a collective bargaining agreement (CBA).  "If

the resolution of a state-law claim depends upon the meaning of a collective

bargaining agreement, the application of state law (which might lead to

inconsistent results, since there could be as many state law principles as there are

States) is pre-empted and federal labor-law principles -- necessarily uniform

throughout the Nation -- must be employed to resolve the dispute." Lingle v. Norge

Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988).  This policy is in place in

order prevent inconsistent results among the states and create uniformity

---

[8] Liggons' is currently researching to find out if he can still seek leave to amend at this stage of this case.

throughout the United States. "As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for Sec. 301 pre-emption purposes." DeCoe v. General Motors Corp., 32 F.3d 212, 216 (6th Cir. 1994) (quoting Lingle, 486 U.S. at 409-10).

In order to determine whether the state claim is sufficiently independent of the CBA, the Sixth Circuit follows a "two-step inquiry" process:

> First, courts must determine whether resolving the state-law claims would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. If the rights were created by the collective bargaining agreement, the claim (As previously explained, Liggons' claims are federal claims that are not preempted, as opposed to state law claims that could possibly be preempted) is preempted. In short, if a state-law claim fails either of these two requirements, it is preempted by § 301.

Mattis v. Massman, 355 F.3d 902, 906 (6th Cir. 2004) (citing DeCoe., 32 F.3d at 216-17). "If the plaintiff can prove all of the elements of his claim without the necessity of contract interpretation, then his claim is independent of the labor agreement." DeCoe, 32 F.3d at 216 (citing Dougherty v. Parsec, Inc., 872 F.2d 766, 770 (6th Cir. 1989)).

First, the right of protection against discrimination based on race or disability and against retaliation is a right given to Liggons' by federal statutes, not the Collective Bargaining Agreement. Further, the mere fact that a broad contractual protection against discriminatory—or retaliatory— discharge may

provide a remedy for conduct that coincidently violates federal law does not make the existence or the contours of the law violation dependent upon the terms of the private contract. Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 412 (1988).

Title VII states that "[i]t shall be an unlawful employment practice for a labor organization to … discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 USC 2000e-2(c)(1).  At the crux of the issue is whether the UAW treated Liggons' differently than other members of the union. This does not require any interpretation of the Collective Bargaining Agreement between the union and the company.  Liggons' Complaint alleges that he was treated differently, in that non-African American members of the Union were treated more favorably in the union's representation of them. Although both Defendants attempt to characterize Liggons' claims as a contract violation to avoid liability, his claims are rooted in discrimination, for which no interpretation of the Collective Bargaining Agreement is required.  Thus, Liggons' claims are not preempted.

Title VII of the Civil Rights Act of 1964 (the "Act") prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act.  Per federal case law and regulatory agency guidance, there are three essential elements in a

claim of retaliation: 1. Protected activity, 2. Adverse action, and 3. Causal connection. Cruz v. Coach Stores, Inc, 202 F.3d 560, 566 (2d Cir. 2000).

Adverse actions include(s): (1) denial of promotion; (2) non-selection/refusal to hire; (3) denial of job benefits; (4) demotion; (5) suspension; (6) discharge; (7) threats; (8) reprimands; (9) negative evaluations; (10) harassment; or (11) other adverse treatment that is likely to deter reasonable people from pursuing their rights.

Title VII retaliation claims must be proved according to traditional principles of but-for causation.  Title VII's anti-retaliation provision appears in a different section from its status-based discrimination ban and uses the term "because" indicating that retaliation claims require proof that desire to retaliate was the but-for cause of the challenged employment action. University of Texas Southwestern Medical Ctr. v. Nassar, No. 12-484 (June 24, 2013).

## Legal Argument

The District claimed that Liggons' does not allege any specific discriminatory conduct occurred in the six months immediately preceding the filing of his complaint on June 2, 2020. (RE 16, PageID 114.)  Therefore, Liggons' claims alleging Defendants discriminated against him on the basis of his race and disability in violating his rights under the CBA are barred by the statute of limitations.  However, Liggons reported that he was harassed by Jeff King on

21

February 10, 2020. (RE 49-16, RE 49-42, RE 62, PageID 1449).  Liggons' also

claims that he was demoted May 18, 2020 (*Id*. @ 1450.)  Due to the pandemic,

Liggons was not able to file his complaint in person with OCRC as he was

accustomed to doing, therefore he had to make his complaint online.  That claim

was processed on August 3, 2020. (RE 39, PageID 379-380.)  Liggons

discrimination claims were dismissed as untimely LMRA § 301 claim.  Liggons'

discrimination claims could be made without the assumption that the terms of the

CBA. Wheat v. Fifth Third Bank, 785 F.3d 230, 237 (6th Cir. 2015) (citing 42

U.S.C. § 2000e-2(a)(1))

Therefore, especially using the "Continuous Violation Doctrine", See Abner

J. Morgan, Jr., v. National Railroad Passenger Corporation, Dba Amtrak,

Defendant-appellee, 232 F.3d 1008 (9th Cir. 2000). Plaintiff asserts that not only is

this a hybrid § 301 / fair representation claim filed timely, but it is also a claim of

discrimination, harassment, hostile work environment and retaliation against both

Defendants GM and UAW Local 14. Plaintiff could not rely on an interpretation of

the terms of an underlying CBA if a breach exists. Martin v. Lake CV. Sewer Co.,

Inc., 269 F.3d 673, 679 (6th Cir. 2001). Where a CBA establishes a mandatory

grievance procedure in which a union pursues claims on behalf of its aggrieved

employee, an employee will be bound by the results obtained in the grievance

process subject to very limited judicial review. DelCostello v. International

Brotherhood of Teamsters, 462 U.S. 151, 164 (1983). The Third Circuit Court of Appeals has explained: Employees may appeal an adverse decision under § 301 if they can show that their union breached its duty of fair representation, that is, that the union's conduct was arbitrary, discriminatory, or in bad faith. Employees may also have their claim heard in federal court under § 301 if the grievance procedure was a 'sham, substantially inadequate or substantially unavailable.'

The Federal Medical Leave Act (FMLA) provides certain employees with up to 12 weeks of unpaid, job-protected leave per year. 29 U.S.C. § 2612 (a)(1)(D). An employee entitled to FMLA leave must be restored to his or her former position or equivalent position upon completion of leave, and "[t]he taking of leave shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." Id. § 2614(a)(1)-(2). Kinds v. Ohio Bell Telephone Company (2013.)

The District Court stated that Liggons' claims these provisions of the 2011 CBA do not apply to him. (Doc. No. 50 at 13). But he does not explain why, and there is nothing within the 2011 CBA which appears to exempt Liggons from coverage. Paragraph 99 of the 2011 CBA states the wage policies do not apply to skilled trades job classification, (Doc. No. 49-11 at 2), but there is no evidence that Liggons' position was classified as a skilled trade job.

23

Liggons' has stated that paragraph 98 does not apply to him because he is not governed by the 2011 CBA. Liggons is governed by the terms of the 2015 CBA. Paragraph 99 in the 2011, 2015 and the 2019 CBA because its language change from to 2011 to 2015 as it only relates to "Performance Bonus." A Performance Bonus is paid to every employee with very little restrictions, making it inconsequential. However, paragraph in the center of the controversy. Liggons' is not classified as a traditional employee; therefore paragraph 98 does not apply to Liggons' in any manner. Paragraph 98 is cost of living adjustment (COLA) that traditional employees gave away in concession during GM's bankruptcy during the 2000's. Liggons' was hire as an "IN-PROGRESSION EMPLOYEE." (RE 39, PageID 399.)

The Four Corner Rule stipulates that if two parties enter into a written agreement, they cannot use oral of implied agreements to contradict the terms. Therefore, Defendant has an implied and express terms in duty of Covenant of Good Faith and Fair Dealing.

A Title VII retaliation claim has different elements than a Title VII discrimination claim, because the "'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element of a Title VII race discrimination claim." Laster v. City of Kalamazoo, 746 F.3d 714, 719 (6th Cir. 2014).

A plaintiff asserting a retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

### Prima Facia

The prima facie requires that evidence showing: (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.  If a prima facie case is established, the burden of production shifts to the Defendants to identify a legitimate, non-discriminatory reason for the materially adverse actions. Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003).  The burden then returns to the Plaintiff to show that the Defendants' proffered reason is a pretext for discrimination.

### 1.  Engaging in Activities Protected by Title VII

Neither Defendants disputes that Liggons' engaging in activities protected by Title VII.

### 2.  His exercise of such protected activity was known by the Defendant

The UAW did not dispute that Liggons' protected activity was known by the Defendant, however, GM disputes that they knew Liggons' had engaged in protected activity.  GM would have gotten the same notice as the UAW,  from the OCRC and the NLRB.  Is GM saying that none of Liggons' complaints were investigated?  GM provided evidence that 3 individuals received letters addressed to them regarding Liggons' complaints.  Sherita Edge (RE 39, PageID 370, 373), DeRonnie Turner (RE 39, PageID 377, 386, 391), and James Ingram (RE 39, PageID 396).  All three individuals are decision makers along with Liz Bezerko, Trish Long, Leticia Pickings (RE 53-1), Amy Nordstandt, Shanna Gordon, Sharita Edge.

The cat's paw theory holds that an employer can be liable for unlawful retaliation or discrimination even when the decisionmaker did not act with a discriminatory or retaliatory motive if he/she was influenced by another employee who did have a discriminatory or retaliatory motive.

### 3.  <u>The defendants took an action that was "materially adverse" to the plaintiff</u>

GM does not dispute that the suspensions Liggons received constitute Materially adverse actions. (RE 62, PageID 1455.)  The UAW failure to resolve grievance D 09040 and D 09092 shows that the UAW were intentional.  The UAW Knew that Liggons was not and is not a "Traditional Employee", specifically Jeff King, Chairperson of Local 14, because he is on the contract negotiation team.

Secondly, paragraph 98 specifically says that "if your wage is $27.79", therefore Liggons' could not have ever been mistakenly categorized as a Traditional Employee with his wages stuck at $19.50 for two years.  Third, with King being on the negotiating team, he is well aware that paragraph 98 in the 2011 CBA was completely rewritten in the 2015 CBA.  Fourth, the UAW spoke of an MOU dated March 4, 2016, yet they have no evidence to show the documents existence prior to April or 2019.  Lastly, if that MOU truly existed why did King write a letter to Liggons' claiming his grievance was at step 1½ on July 23, 2018 (RE 49-22).

The UAW showed the same level of deniability when it came to Liggons' Doc. No. 8 suspensions (not filing of grievances) and any suspensions Liggons' received after January of 2018 which equated to greater than two weeks every time.  Liggons receive a suspension 100% of the time of any allegation.  The UAW allowed Liggons' to be suspended for two weeks right after Liggons' made a complaint that he was being harassed.

## 4. <u>A causal connection existed between the protected activity and the materially adverse action</u>

Both Defendants have been successful in misdirection.  Liggons' filed his first OCRC complaint in October of 2017, Liggons's was suspended in January of 2018 for reporting to work late.  Temporal proximity still exists knowing that each complaint investigation may take anywhere from 60 to 90 days.  In the Sixth Circuit, "temporal proximity alone can be enough" to establish causation. Montell

v. Diversified Clinical Services, 757 F.3d 497, 505 (6th Cir.2014).  The first question, was it severe weather on that day Liggons' was late?  Was Liggons' the only employee late on that day?  If Liggons' was not the only person late on that day, did those people receive a 30-day suspension or just a suspension?  If it was severe weather on that day, was that tardiness justified with a 30-suspension?  Why wasn't Liggons' allowed to use a vacation day?

Liggons' filed a complaint with the NLRB on February 21, 2019, in April of 2019 Liggons' was suspended for 45-days.  Liggons filed a complaint over his 45-day suspension.  In June of 2019, Liggons' was suspended for 2-weeks after he reported that he was being harassed and subsequently suspended for another 30-days when he returned back to because he was 57 minutes late.  Liggons was suspended 88 days within a 138-day period.

## **CONCLUSION**

Contrary to Defendant's consistent attempt to misdirect the attention from the material facts, GM's actions show a malicious intent with an elaborate effort to conceal unfair employment practices including a clear breach of contract.  Liggons' has provided substantial evidence to support a claim of discrimination, hostile work environment and retaliation.

For the reasons stated above Appellant respectfully request that this court REMAND this case back to District Court for further review.

Respectfully Submitted,

/s/ Shawn L. Liggons
Shawn L. Liggons
*Pro Se* Plaintiff - Appellant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief complies with the type volume limitation

of Fed. R. App. P. 32(a)(6) and Fed. R. App. P. 32(a)(7)(B) as it was prepared in

using Times New Roman, 14 pt. Font, and contains 7,673 words.

Respectfully Submitted,

/s/ Shawn L. Liggons
Shawn L. Liggons
*Pro Se* Liggons' - Appellant

## <u>PROOF OF SERVICE</u>

I hereby certify that on March 27, 2024, a copy of Appellant's Certification

was electronically filed with the Clerk of Court by email on March 27, 2024.

Notice of this filing will be sent to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system, including

the following:

Kristin Seifert Watson, Esq.
Lane C. Hagar, Esq.
Cloppert, Latanick, Sauter & Washburn
225 E. Broad Street
Columbus, Ohio 43215
614-461-4455 614-621-6293 (Fax)
kwatson@cloppertlaw.com
lhagar@cloppertlaw.com

Attorneys for Defendant United Automobile, Aerospace and Agricultural
Implement Workers of America Local 14

Ellen Toth
Samuel H. Ottinger
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Key Tower
127 Public Square, Suite 4100
Cleveland, OH 44114
216-241-6100
216-357-4733 (FAX)
ellen.toth@ogletree.com
samuel.ottinger@ogletree.com

Attorneys for Defendant General Motors, LLC

/s/ Shawn L. Liggons
*Pro Se* Plaintiff - Appellant

31

## <u>DESIGNATION OF RELEVANT</u><br><u>DISTRICT COURT DOCUMENTS</u>

|  | **Record Entry #** | **Page ID #** |
|---|---|---|
| Memorandum of Opposition to GM<br>Motion to Dismiss | 13 | 89-99 |
| March 31, 2021, Opinion and Order | 16 | 109-115 |
| August 25, 2021, Order | 27 | 161-162 |
| Liggons Depo. I<br>General Motors Exhibits A - DD | 39 | 185-479 |
| Liggons Depo. II<br>General Motors Exhibits EE<br>UAW Exhibits U1 – U28 | 40 | 480-696 |
| MOU For Employees In Progression | 41-1 | 701-704 |
| MOU For Wage Calculations | 41-2 | 705 |
| PeopleSoft History 08-16-2010 Thru 05-18-2020 | 41-3 | 706-707 |
| GM Motion for Summary Judgment | 42 | 709-734 |
| Declaration of Jeffrey King | 43-2 | 775-777 |
| Declaration of Michael Greason | 43-3 | 778-780 |
| Declaration of Kristin Seifert Watson | 43-4 | 781-784 |
| Plaintiff Grievances D 09040 & D 09092 | 48-1 | 805-808 |
| GMs Alleged Unauthorized Recording Policy | 48-3 | 836 |
| Paragraph 98 – 2015 CBA | 48-5 | 838-840 |
| Conditional Dismissal Case 08-CB-248782 | 48-7 | 860-862 |

| | | |
|---|---|---|
| Conf. Wit. Aff. Case 08-CB-226329/08-CA-226332 | 48-9 | 882-890 |
| Letter to Mike Greason - May 16, 2019 | 48-11 | 892-894 |
| Letter to Mike Greason - August 29, 2019 | 48-13 | 901-902 |
| Letter to Mike Greason - September 4, 2019 | 48-15 | 922 |
| 2015 Hourly Contract Highlights | 48-16 | 923-925 |
| Letter to Robin Marr - August 21, 2017 | 48-19 | 929-949 |
| Paragraph 98 and 99 Of The 2011 CBA | 48-21 | 954-962 |
| Paragraph 98 & 99 2015 CBA (White Book) | 48-23 | 968-981 |
| Notice of Disciplinary Action 04-10-19 | 48-25 | 983-984 |
| Team Leader Follow-up 07-24-20 | 48-28 | 987 |
| Team Leader Follow-up 07-24-20 | 48-31 | 994-994 |
| Aware line Inv. 09-14-20 (Jeff King Harassment) | 48-32 | 996 |
| Aware line Investigation 07-10-20 (Team Leader) | 48-33 | 997-1002 |
| My Complete Team Leader Process | 48-35 | 1004-1019 |
| My Formal Written Statement (Harassment) Dated 07-12-2019 With Interview On 07-16-2019 | 48-37 | 1021-1026 |
| Raise & Discipline Month Calculator | 48-41 | 1031 |
| Letter From Jeff King 07-23-2018 | 48-42 | 1032 |
| Onboarding New User 02-12-2020 For Team Leaders | 48-43 | 1033 |
| Excessive Discipline 08-23-2016 | 48-44 | 1034 |
| Notice of Discipline Action 2019 (Mike Paulson) | 48-45 | 1035-1036 |

GM Response To OCRC 22A-2019-01587C                  48-46        1037-1039

From GM 05-01-19 Response (39731) 01587C            48-47        1040-1049

From UAW 04-25-19 Response (39731) 01588C           48-48        1050-1051

Grievances 49-20

Liggons' Brief in Opposition to GM - MSJ            50           1315-1337

GM Reply in Support of its MSJ                      53           1340-1351

DECLARATION OF LETICIA                              53-1         1352-1362

UAW LOCAL 14'S Reply in Support of MSJ             54           1363-1379

Declaration of Robin Marr                           54-1         1380-1381

Liggons' Brief in Opposition to UAW - MSJ          55           1385-1416

UAW LOCAL 14'S Reply to Plaintiff April 18, 2023    60           1422-1435
Brief in Opposition to UAW Local 14' MSJ

September 27, 2023, Opinion and Order               62           1445-1457

## **APPEAL EXIHIBITS**

Appeal Exhibit A                    Timecard for 01-08-18 Thru  01-14-18

Appeal Exhibit B                    January 12, 2016 Weather

Appeal Exhibit C                    April 2019 Calendar

Appeal Exhibit D                    Timecard for 04-01-19 Thru  04-07-19

Appeal Exhibit E                    July 2016 Calendar

Appeal Exhibit F                    2023 UAW GM White Book (CSA)

Appeal Exhibit G                    2023 Paragraph 98 White Book (CSA)

Appeal Exhibit H                    2023 Contract Hourly Highlights

Appeal Exhibit I                    NLRB Appeal 08-25-2020

Appeal Exhibit J                    NLRB Appeal 09-29-2020

# Time Detail

| | |
|---|---|
| Time Period: | 1/08/2018 - 1/14/2018 |
| Query: | Previously Selected Employee(s) |
| Actual/Adjusted: | Show hours credited to this period only. |

| | |
|---|---|
| Data Up to Date: | 4/26/2018 3:37:37 AM |
| Executed on: | 4/26/2018 3:37:36 AM |
| Printed for: | szrj1m |
| Insert Page Break After Each Employee: | No |

| EMPTY | EMPTY | 4/26/2018 |
|---|---|---|
| | | 3:37:37 AM |

| Employee: | Liggons. Shawn L | ID: | 183256515 | Time Zone: | Eastern |
|---|---|---|---|---|---|
| Status: | Active | Status Date: | 4/16/2018 | Pay Rule: | US-01067-01 Std |

| Primary Account | | Start | End | |
|---|---|---|---|---|
| 001/KD70000653601100028000000000/01067-H-06536-0000/01067-N78A/-/2/- | | 6/5/2017 | Forever | GM/USA/001/US00002459/01067/01067H6536/6536-2/QUALITY OPERATOR III- |

Case: 23-3890   Document: 24   Filed: 03/27/2024   Page: 42

# Time Detail

| | | |
|---|---|---|
| Time Period: | 1/08/2018 - 1/14/2018 | |
| Query: | Previously Selected Employee(s) | |
| Actual/Adjusted: | Show hours credited to this period only. | |

| Date/Time | | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: | Account | | | Comment | | Xfr: | Work Rule | | | | | |
| 1/8/2018 | 7:00 AM | | OT CodeA Sched Prod | | | | | 4.00 | | | | 4.00 |
| | | | | OT Offering Day1-Mon | | | | | | | | |
| 1/8/2018 | | | 3:54:00 PM | | 12:06:00 AM | | | | | | 7.60 | 11.60 |
| 1/9/2018 | | | 12:12:00 AM | | 3:19:00 AM | | | | | | 2.70 | 14.30 |
| 1/9/2018 | 7:00 AM | | OT CodeA Sched Prod | | | | | 4.00 | | | | 18.30 |
| | | | | OT Offering Day2-Tue | | | | | | | | |
| 1/9/2018 | | | 3:53:00 PM | | 3:18:00 AM | | | | | | 10.30 | 28.60 |
| 1/10/2018 | 7:00 AM | | OT CodeA Sched Prod | | | | | 4.00 | | | | 32.60 |
| | | | | OT Offering Day3-Wed | | | | | | | | |
| 1/10/2018 | | | 4:02:00 PM | | 9:30:00 PM | | | | | | 5.00 | 37.60 |
| 1/10/2018 | | | 9:57:00 PM | | 3:00:00 AM | | | | | | 5.00 | 42.60 |
| 1/11/2018 | 7:00 AM | | OT CodeA Sched Prod | | | | | 4.00 | | | | 46.60 |
| | | | | OT Offering Day4-Thu | | | | | | | | |
| 1/11/2018 | | | 4:00:00 PM | | 9:24:00 PM | | | | | | 4.90 | 51.50 |

# Time Detail

| Time Period: | 1/08/2018 - 1/14/2018 | Data Up to Date: | 4/26/2018 3:37:37 AM |
|---|---|---|---|
| Query: | Previously Selected Employee(s) | Executed on: | 4/26/2018 3:37:36 AM |
| Actual/Adjusted: | Show hours credited to this period only. | Printed for: | szrj1m |
| | | Insert Page Break After Each Employee: | No |

| Date | Time | Description | Start | End | Hours | Credit | Total |
|---|---|---|---|---|---|---|---|
| 1/11/2018 | | | 9:54:00 PM | 10:00:00 PM | | 0.10 | 51.60 |
| | | US-Tardy | | | | | |
| 1/11/2018 | 9:54 PM | Tardy Exception | | | 0.10 | | |
| 1/11/2018 | | | 9:57:00 PM | 3:18:00 AM | | 5.30 | 56.90 |
| | | [Marked as Reviewed] | | | | | |
| | | US-01067-01-A9-UPLB | | | | | |
| 1/12/2018 | 12:00 AM | IVR Call-In Notification | | | 1.00 | | 56.90 |
| | | IVR Call-In - Personal Time Off | | | | | |
| 1/12/2018 | 7:00 AM | OT CodeA Sched Prod | | | 4.00 | | 60.90 |
| | | OT Offering Day5-Fri | | | | | |
| 1/12/2018 | | | 4:30:00 PM | 8:12:00 PM | | 3.70 | 64.60 |
| | | US-Tardy | | | | | |
| 1/12/2018 | 4:30 PM | Tardy Exception | | | 3.70 | | |
| 1/12/2018 | | | 8:08:00 PM | 11:54:00 PM | | 3.70 | 68.30 |
| | | [Marked as Reviewed]    EV | | | | | |
| | | US-01067-01-A9-UPLB | | | | | |
| | | I: MISC | | | | | |
| 1/12/2018 | | | 11:54:00 PM | 3:00:00 AM | | 3.10 | 71.40 |
| | | US-Volunteer To Leave | | | | | |
| 1/12/2018 | 11:54 PM | Volunteer To Leave Exception | | | 3.10 | | |



Severe Weather Approaching Your Area Immediately! Check Live Local Radar Now.

myweatherupdatenow.com

**OPEN**

**Select month:** | January 2018 | ∨ |

# January 2018 Weather in Toledo — Graph F

| | Fri, Jan 12 | | | | Sat, Jan 13 | | |
|---|---|---|---|---|---|---|---|
| pm | 12 am | 6 am | 12 pm | 6 pm | 12 am | 6 am | 12 pm |

Hi:55  Hi:55  Hi:39  Hi:25  Hi:19  Hi:14  Hi:16  Hi:18

Lo:54  Lo:41  Lo:25  Lo:19

DC  Dream Calendars                    ‹  ›  ⋮  ✕

# 2019 APRIL

| SUN | MON | TUE | WED | THU | FRI | SAT |
|-----|-----|-----|-----|-----|-----|-----|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |

Free Calendar Templates **Dreamcalendars.com**

### April 2019 calendar | Free blank printable with holidays

Visit ›

Images may be subject to copyright. **Learn More**

⇗ Share                                    🔖 Save

 Micoope
April 2019 Calendar Printable A …

▣ DeviantArt
April 2019 Calendar Free Vecto…

Ⓦ www.formasup.fr
April 2019 Calendar Templates …

(/)
👤 SHAWN LIGGONS | Logout ⏻

**Main Menu** ˅

*LARRY SMITH*
*NO CALL, NO SHOW*
*1. 3/29 & 4/1*

# Rings Report

## Time Card

| Week Ending 04/07/2019 | | | Employee Workspan | | Absence Info | | Employee Rings | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Day | Total Hours | Start | End | HR | CD | | In | Out | In | Out |
| Mon | 8.0 | 15:00 | 23:30 | 8.0 | Vac Rest Unplanned VA | | | | | |
| Tue | 8.0 | 15:00 | 23:30 | 1.0/8.0 | IVR Call-In Notification/Vac Rest Unplanned VA | | | | | |
| Wed | 0.0 | 15:00 | 23:30 | 1.0/8.0 | IVR Call-In Notification/Absence Unexcused U | | | | | |
| Thu | 0.0 | 15:00 | 23:30 | 8.0/1.0 | Absence Unexcused U/IVR Call-In Notification | | | | | |
| Fri | 8.0 | | | 8.0/1.0 | Vacation VP/IVR Call-In Notification | | | | | |
| Sat | 0.0 | | | 8.0/1.0 | OT CodeA Sched | | | | | |

© 2019 General Motors (http://www.gm.com/) | User Guidelines (http://www.gm.com/toolbar/user_guidelines.html) | Copyright/Trademark (http://www.gm.com/toolbar/copyrightTrademark.html)

Notification

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sun | 0.0 | | | 1.0 | IVR Call-In Notification | | | | |
| Total | 24.00 | | | | | | | | |

### Week Ending 04/14/2019

| | | Employee Workspan | | Absence Info | | Employee Rings | | | |
|---|---|---|---|---|---|---|---|---|---|
| Day | Total Hours | Start | End | HR | CD | In | Out | In | Out |
| Mon | 2.2 | 15:00 | 23:30 | | | 14:55 | 17:12 | 17:33 | |
| Tue | 0.0 | 15:00 | 23:30 | | | | | | |
| Wed | 0.0 | 15:00 | 23:30 | | | | | | |
| Thu | 0.0 | 15:00 | 23:30 | | | | | | |
| Fri | 0.0 | 15:00 | 23:30 | | | | | | |
| Sat | 0.0 | | | | | | | | |
| Sun | 0.0 | | | | | | | | |
| Total | 2.20 | | | | | | | | |

# Accruals

| | | | |
|---|---|---|---|
| 0 VA not allowed for EE. Contact Labor For Details | 24 | Vacation | 52 |
| | | Vacation Restricted | 0 |
| Holiday Deferred | 0 | | |

© 2019 General Motors (http://www.gm.com/) | User Guidelines (http://www.gm.com/toolbar/user_guidelines.html) | Copyright/Trademark (http://www.gm.com/toolbar/copyrightTrademark.html)

https://hcc.gm.com/HCC/us/en/Kronos/RingsReport                                4/8/2019

 Calendarpedia

# July 2016

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |  |  |  |  |  |  |

Data provided 'as is' without warr

© www.calendarpedia.com

July 2016 Calendar | Templates for Word, Excel and PDF

Visit ›

Images may be subject to copyright. **Learn More**

Share          Save

**(98)(a) General Increases**. ~~During the 2023~~
~~National Negotiations, the parties agreed that~~
~~Manufacturing Traditional production employees (those~~
~~other than skilled manufacturing employees hired prior to~~
~~October 16, 2007) and Skilled Trades journeypersons~~
~~Employees~~ whose straight time hourly wage rate was
$29.10 or more as of September 14, 2020, shall receive an
increase to their base wage rate (exclusive of shift
premium, seven-day operator premium, and any other
premiums) ~~effective on~~~~the~~ October 23, 2023 and thereafter
in accordance with the table below.

| | 10/23/2023 | Effective 09/16/2024 | Effective 09/15/2025 | Effective 09/21/2026 | Effective 09/20/2027 |
|---|---|---|---|---|---|
| General Wage Increase % | *11%* | *3%* | *3%* | *3%* | *5%* |

~~Straight Time~~
~~Hourly~~
~~Wage Rate~~ ~~Wage Increase~~
~~Less than 29.10..................................................$0.86~~
~~29.10 – 29.16.....................................................$0.87~~
~~29.17 – 29.49.....................................................$0.88~~
~~29.50 – 29.83.....................................................$0.89~~
~~29.84 – 30.16.....................................................$0.90~~
~~30.17 – 30.49.....................................................$0.91~~
~~30.50 – 30.83.....................................................$0.92~~
~~30.84 – 31.16.....................................................$0.93~~
~~31.17 – 31.49.....................................................$0.94~~
~~31.50 – 31.83.....................................................$0.95~~
~~31.84 – 32.16.....................................................$0.96~~
~~32.17 – 32.49.....................................................$0.97~~
~~32.50 – 32.83.....................................................$0.98~~
~~32.84 – 33.16.....................................................$0.99~~
~~33.17 – 33.49.....................................................$1.00~~
~~33.50 – 33.83.....................................................$1.01~~
~~33.84 – 34.16.....................................................$1.02~~
~~34.17 – 34.49.....................................................$1.03~~
~~34.50 – 34.83.....................................................$1.04~~
~~34.84 – 35.16.....................................................$1.05~~
~~35.17 – 35.49.....................................................$1.06~~
~~35.50 – 35.83.....................................................$1.07~~
~~35.84 – 36.16.....................................................$1.08~~
~~36.17 – 36.49.....................................................$1.09~~
~~36.50 – 36.83.....................................................$1.10~~
~~36.84 – 37.16.....................................................$1.11~~
~~37.17 – 37.49.....................................................$1.12~~
~~37.50 – 37.83.....................................................$1.13~~
~~37.84 – 38.16.....................................................$1.14~~
~~38.17 – 38.49.....................................................$1.15~~
~~38.50 – 38.83.....................................................$1.16~~
~~38.84 – 39.16.....................................................$1.17~~
~~39.17 – 39.49.....................................................$1.18~~
~~39.50 – 39.83.....................................................$1.19~~
~~39.84 – 40.16.....................................................$1.20~~

**7**

OCT 3 1 2023

DATE INITIALED:_____

INITIALED BY PARTIES: MP    MSY

**(98)(b)** ~~Effective September 19, 2022, employees who were eligible for a base wage increase pursuant to Paragraph (98)(a) above shall receive a second base wage increase to their straight time hourly wage rate (exclusive of shift premium, seven-day operator premium, and any other premiums) in accordance with the table defined in Paragraph (98)(a).~~

~~NOTE:  In the case of a classification, the rate for which is determined by a wage rule in the Local Wage Agreement relating the rate for the classification to the rate for another classification or classifications, the above tables will determine the rate for the classification where there is a conflict with such wage rule.~~
~~[See Par. (119) (183)(e)]~~
On the effective date of the Agreement, Skilled Trades Journeypersons will receive a one-time tool allowance premium of $1.50 added to the base hourly rate.  This tool allowance supersedes and replaces all other tool allowances for Skilled Trades.

8

DATE INITIALED: ___OCT 3 1 2023___

**098bB02**                    **1**                    INITIALED BY PARTIES: MP  *MƐᶄ*



**OCT 2023**



# UAW GM AGREEMENT



**Highlights** Inside

# A Message to UAW Members at GM



Dear UAW GM family,

I think we can all agree that this has been a historic round of negotiations. When we say we have made history, we don't just mean our leadership and our national negotiators. We mean we, the UAW. We mean the brave Stand Up Strikers of Local 2250 Wentzville Assembly. Then came the reinforcements, at all our CCA facilities across the country, shutting down the parts depots from California to North Carolina. Soon they were joined by the members of Local 602 at Lansing Delta Assembly. That wasn't enough for GM. So we took out the big guns: Arlington Local 276 put the company on the ropes, and mighty Spring Hill Local 1853 landed the knockout blow.

Everything we did at the bargaining table, every extra hundred million we got the company to give up, was because of you, the members. We send this contract to you because we know it breaks records. We know it will change lives. But what happens next is up to you all.

We set out to do many things that we were told were impossible. We fought like we've never fought before, and we won like we've never won since the days of Walter Reuther. We got back COLA. We brought back a three-year wage progression. We killed the wage tiers at CCA and GMCH. We brought Subsystems and Brownstown into the Master Agreement.

We also achieved something we were told just weeks ago was impossible: we brought Ultium Cells workers who make electric vehicle batteries for GM into our Master Agreement as well. We have stopped the race to the bottom, and are ensuring that green jobs are good jobs.

When we say it's a record contract, that's not just talk. The gains in this agreement are worth more than four times the gains in the 2019 contract. In fact, the gains in each individual year of this agreement are worth more than the entirety of the gains in the last contract. The 2023 agreement is worth more than the past four contracts combined. It has more in General Wage Increases than GM workers have received in the past 22 years combined.

And it's not just record-breaking. As we've said, this contract will change lives.

- Our lowest-paid members will see a 158 percent raise through the life of this agreement. That's not a typo. Temps hired this year at $16.67 will earn over $40 per hour in base wages by the end of this agreement, over $42 an hour with COLA.

- Our CCA, GMCH, Subsystems, and Brownstown members will see an immediate wage boost from 36 to 89 percent. A current GMCH member with 3 years of service, for instance, will see their hourly wages jump nearly $17 overnight.

- With COLA, by 2028, we'll have a top rate of over $42 an hour for production, and over $50 for skilled trades, an over 30 percent raise. By the end of this agreement, our starting rate will be over $30 an hour, a 70 percent bump from today.

And just as importantly, we did it together. From the International Executive Board and the President's Office to the UAW GM Department, to our national negotiators, our National GM Council, our local leadership, and our rank-and-file members, everyone played a role in securing this victory.

We went into this round of bargaining with the goal of addressing decades of concessions and givebacks. We know that the Stand Up Strike will go down in history. For months we have insisted that "Record Profits Mean Record Contracts," and after standing together, we made good on that demand. While we may not have won everything we wanted, we won more than most people thought was possible. This contract will not only change lives now, but it lays the foundation for even bigger gains in the future. That is why we both whole-heartedly endorse this tentative agreement.

In solidarity,

**Shawn Fain, President**
International Union, UAW

**Mike Booth, Vice President**
UAW GM Department



QR Code for
White Book



# Highlights

- 10% 401k Employer Contribution
- $1,500 voucher toward vehicle purchase
- Cola Reinstated
- Just Transition: Battery Work Under Master Agreement
- One Step Removed from Attendance procedure
- Historic Wage Increase
- Tuition Assistance for Dependents reinstated at $1,600
- Wage Tiers Eliminated
- Tuition Assistance increased to $8,000
- Grow In reduced to 3 years
- No more tiered vacation time
- Secured Vacation Time
- All full-time temps with 90 days converted to in-progression
- All new temps converted to in-progression after 9 months
- Enhanced Relocation Package increased to $37,500
- Skilled Trades $1.50 Tool Allowance
- Product Investment
- Healthcare Enhancements

- Profit Sharing Maintained and expanded to Temporaries
- $5,000 Ratification bonus
- EV Work Commitment
- Journey persons can not be forced to production
- Special Attrition Program (SAP)
- Right to strike over Plant Closures, Outsourcing, & Investment
- Outsourcing Moratorium
- Additional Holiday added: Juneteenth
- Sub Pay eligible for all employees after 3 months including full-time temporary employees
- Paid Parental Leave
- Retirement improvements for all
- Improvements to Industrial Hygiene and Ergonomics
- Considerations for married couples transferring
- Members with less than 2 years can transfer within the area hire
- $500 annual payment to eligible retirees
- Sub Systems employees now fall under the National Agreement
- Battery EV Plant Agreements

3

# HISTORIC WAGE INCREASES | 7

This tentative agreement provides historic economic gains for UAW members at GM through a combination of annual General Wage Increases (GWI), the reinstatement of Cost of Living Allowance (COLA), the shortening of the wage progression, the elimination of wage tiers, and the conversion of temporary workers.

Through April 30, 2028, UAW members will receive more in general wage increases than they have in the past 21 years combined. Upon ratification, members at top rate will receive an 11% wage increase, almost as much as GM workers have received in total since 2007. Members currently on lower wage tiers, temporary workers, and those not at top rate, will receive raises ranging from 36% to 89%, due to the immediate conversion to a shortened wage progression, and conversion of all temps.

## GENERAL WAGE INCREASES (GWI)

| DATE | GWI Percentage |
|---|---|
| Upon Ratification | 11% |
| September - 2024 | 3% |
| September - 2025 | 3% |
| September - 2026 | 3% |
| September - 2027 | 5% |

**} 25%**

### Top Rate Example
General Wage Increases (GWI)
(With Projected COLA)

| | Production* | Skilled Trades* |
|---|---|---|
| **Current Top Rate** | **$32.32** | **$36.85** |
| 11% GWI (Upon Ratification) | $3.56 | $4.05 |
| Skilled Trades Tool Allowance | - | $1.50 |
| 2023 COLA Estimate | $0.12 | $0.12 |
| **End of 2023 Top Rate** | **$36.00** | **$42.52** |
| 3% GWI (September 2024) | $1.08 | $1.27 |
| 2024 COLA Estimate | $0.45 | $0.45 |
| **End of 2024 Top Rate** | **$37.53** | **$44.24** |
| 3% GWI (September 2025) | $1.11 | $1.31 |
| 2025 COLA Estimate | $0.36 | $0.36 |
| **End of 2025 Top Rate** | **$39.00** | **$45.91** |
| 3% GWI (September 2026) | $1.14 | $1.35 |
| 2026 COLA Estimate | $0.39 | $0.39 |
| **End of 2026 Top Rate** | **$40.53** | **$47.65** |
| 5% GWI (September 2027) | $1.96 | $2.32 |
| 2027/2028 COLA Estimate | $0.46 | $0.46 |
| **End of Contract Top Rate** | **$42.95** | **$50.43** |

### Start Rate Example
General Wage Increases (GWI)
(With Projected COLA)

| | Production |
|---|---|
| **Current Start Rate** | **$18.04** |
| 39% Increase-New Progression | $7.08 |
| 2023 COLA Estimate | $0.12 |
| **End of 2023 Start Rate** | **$25.24** |
| 3% GWI (September 2024) | $0.75 |
| 2024 COLA Estimate | $0.45 |
| **End of 2024 Start Rate** | **$26.44** |
| 3% GWI (September 2025) | $0.78 |
| 2025 COLA Estimate | $0.36 |
| **End of 2025 Start Rate** | **$27.58** |
| 3% GWI (September 2026) | $0.80 |
| 2026 COLA Estimate | $0.39 |
| **End of 2026 Start Rate** | **$28.77** |
| 5% GWI (September 2027) | $1.37 |
| 2027/2028 COLA Estimate | $0.46 |
| **End of Contract Start Rate** | **$30.60** |

**\*Based on most-populated base rate**

## WAGE INCREASE RETROACTIVE TO OCTOBER 23, 2023

# TEMPORARY WORKERS

## NEW STARTING WAGE: $21.00 | 63

Your UAW national negotiators went into this set of negotiations with the mindset to improve all areas for the temporary workforce. The misuse of temporary workers has historically been an issue and was one of the top priorities of your negotiating team. Upon ratification all active temps with over three months of continuous service will be converted to full-time status after ratification. Major improvements in all aspects of the temporary workforce were achieved, including the time of employment it takes to become full-time. The UAW national negotiators were able to win improvements for temporary workers, many of which help bring equality within our membership.

### All Full-Time Temporary Workers to be Converted to Senority Status | 64
Your national negotiators were able to win language that will allow for the converting of all full-time temporary workers with three months of continuous service. Upon ratification all full-time temporary workers who have three months of continuous service will convert to full-time status. Those who do not have three months of continuous service will convert upon reaching 9 months of continuous employment or if there is a full-time need at the facility, whichever happens first.

### 9-Month Maximum Period to Full-Time Status | 64, 65, 314
Your bargaining team was successful in lowering the maximum length of time it takes a full-time temporary worker to convert to senority status to 9 months of continuous employment.

30 days needed to break time as a temporary member has been increased to 60 days.

### Temporary Workers Now Eligible for Profit Sharing Plan | EX. F 7 PLUS A
Your bargaining team was able to win eligibility for temporary workers into the Profit Sharing Plan, starting in 2024 for plan year 2023. This is a historic win for these members, as it is the first time they will be eligible for the Profit Sharing Plan since its inception.

### Temporary Workers Eligible for Bereavement and Jury Duty Pay | 278
Your negotiators were able to win language for temporary workers to be eligible for Bereavement and Jury Duty pay, with the same qualifying paid time off as a seniority member.

### Ratification Bonus | 236
All active Temporary Workers with 90 days service prior to effective date will receive the $5,000 Ratification Bonus. Payment will be made within two weeks of ratification of the agreement.



## Wage Increases for Current Full-Time Temps with Three Months of Continuous Service

| Current | | 51% | Immediate | 10% | Step Increase | 17% | Step Increase | 21% | Step Increase | Step Increase |
|---|---|---|---|---|---|---|---|---|---|---|
| Seniority | Hourly Rate | | | | | | | | | |
| 90 days to 52 weeks | $16.67 | | $25.12 | | $27.72 | | $32.36 | | $39.12 | $41.17 |
| 53 weeks to 104 weeks | $16.67 | 61% | $26.91 | 17% | $31.42 | 21% | $38.07 | 3% | $39.12 | $41.17 |

• Total wage increase ($16.67 to $41.17) is a 147% compounded increase

* Credit received for all time worked
* Does not include estimated $1.78 COLA over CBA term

# New Hire Wage Progression | 113

In a major victory, we have shortened the wage progression from the current eight years to just three years to top rate. Members will now reach top rate of their classification upon completion of working on active roll for 156 weeks (3 years). Current members will be placed and paid the appropriate hire-in-rate based upon the number of weeks on active roll as of the effective date of the 2023 Collective Bargaining Agreement.

## HIRING-IN RATE SCHEDULE (3-YEAR GROW-IN)

| On Active Roll | % of Top Classification Rate |
|---|---|
| First 52 Weeks | 70% |
| Upon Completion of 52 Weeks | 75% |
| Upon Completion of 104 Weeks | 85% |
| Upon Completion of 156 Weeks | Top Rate |

## HOW WILL MY WAGES CHANGE?

| My Current Wage | Immediate Adjustments at Ratification 2023 | + 52 week step increase | September 2024 3% Increase | +52 week step increase | September 2025 3% Increase | +52 week step Increase | September 2026 3% Increase | September 2027 5% Increase |
|---|---|---|---|---|---|---|---|---|
| $18.04 | $25.12 | $26.91 | $27.72 | $31.42 | $32.36 | $38.07 | $39.21 | $41.17 |
| $19.10 | $26.91 | $30.50 | $31.42 | $36.96 | | | | |
| $20.69 | $30.50 | $35.88 | | | | | | |
| $24.40 | $35.88 | | $36.96 | | $38.07 | | | |
| $25.46 | | | | | | | | |
| $26.52 | | | | | | | | |
| $27.58 | | | | | | | | |
| $29.71 | | | | | | | | |
| $32.32 | | | | | | | | |

**\* Rates in table above do not include COLA estimated to add $1.78 over life of agreement.**

## IMMEDIATE WAGE INCREASES - PRODUCTION



| Current (8-year progression) | |
|---|---|
| Seniority | Hourly Rate |
| Start | $18.04 |
| 1 Years | $19.10 |
| 2 Years | $20.69 |
| 3 Years | $24.40 |
| 4 Years | $25.46 |
| 5 Years | $26.52 |
| 6 Years | $27.58 |
| 7 Years | $29.71 |
| 8 Years | Top Rate |

39% increase
41%
47%
47%

11% - 41%
**Immediate Top Rate**

| Tentative Agreement (3-year progression) | | |
|---|---|---|
| Seniority | Progression | 2023: |
| Start | 70% | $25.12 |
| 1 Years | 75% | $26.91 |
| 2 Years | 85% | $30.50 |
| 3 Years | 100% | $35.88 |

**Continue through "How Will My Wages Change" table above**

**\*Step increases based on achieving 52 weeks worked.**

# ENDING WAGE TIERS AT GM | 76, 113-114, 303

Winning equal pay for equal work at GM was a major priority in these negotiations. We are excited to announce that this tentative agreement ends all wage tiers at GM. All CCA, GMCH, and Subsystems members will immediately convert to the main production rate upon ratification. We were also able to bring Subsystems members into the Master Agreement.

After killing wage tiers, **IMMEDIATE WAGE INCREASES** ranging from

## 36 TO 89%

*upon ratification*

### Immediate Wage Increases Lower-Tiered CCA Members

| Current (8-year progression) | | | | Tentative Agreement (3-year progression) | | |
|---|---|---|---|---|---|---|
| Seniority | Hourly Rate | | | Seniority | Progression | 2023: |
| Start | $17.00 | 48% increase | | Start | 70% | $25.12 |
| 1 Year | $18.00 | 50% | | 1 Year | 75% | $26.91 |
| 2 Years | $19.00 | 61% | | 2 Years | 85% | $30.50 |
| 3 Years | $20.00 | 79% | | 3 Years | 100% | $35.88 |
| 4 Years | $21.00 | | | | | |
| 5 Years | $22.00 | 44% - 71% | | Continue through "How Will My Wages Change" table | | |
| 6 Years | $23.00 | Immediate Top Rate | | | | |
| 7 Years | $24.00 | | | | | |
| 8 Years | $25.00 | | | | | |

### Immediate Wage Increases - GMCH

| Current (8-year progression) | | | | Tentative Agreement (3-year progression) | | |
|---|---|---|---|---|---|---|
| Seniority | Hourly Rate | | | Seniority | Progression | 2023 |
| Start | $16.25 | 55% increase | | Start | 70% | $25.12 |
| 1 Year | $17.16 | 57% | | 1 Year | 75% | $26.91 |
| 2 Years | $18.06 | 69% | | 2 Years | 85% | $30.50 |
| 3 Years | $18.96 | 89% | | 3 Years | 100% | $35.88 |
| 4 Years | $19.86 | | | | | |
| 5 Years | $20.46 | 59% - 81% | | Continue through "How Will My Wages Change" table | | |
| 6 Years | $21.07 | Immediate Top Rate | | | | |
| 7 Years | $21.70 | | | | | |
| 8 Years | $22.50 | | | | | |

### Immediate Wage Increases - Subsystems (Brownstown & Battery Assembler)

| Current (6-year progression) | | | | Tentative Agreement (3-year progression) | | |
|---|---|---|---|---|---|---|
| Seniority | Hourly Rate | | | Seniority | Progression | 2023 |
| Start | $18.50 | 36% increase | | Start | 70% | $25.12 |
| 1 Year | $19.00 | 42% | | 1 Year | 75% | $26.91 |
| 2 Years | $20.00 | 53% | | 2 Years | 85% | $30.50 |
| 3 Years | $21.00 | 71% | | 3 Years | 100% | $35.88 |
| 4 Years | $22.00 | | | | | |
| 5 Years | $23.00 | 50% - 63% | | Continue through "How Will My Wages Change" table | | |
| 6 Years | $24.00 | Immediate Top Rate | | | | |

### Immediate Wage Increases - Subsystems (Non-Battery)

| Current (6-year progression) | | | | Tentative Agreement (3-year progression) | | |
|---|---|---|---|---|---|---|
| Seniority | Hourly Rate | | | Seniority | Progression | 2023 |
| Start | $18.50 | 36% increase | | Start | 70% | $25.12 |
| 1 Year | $19.00 | 42% | | 1 Year | 75% | $26.91 |
| 2 Years | $19.50 | 56% | | 2 Years | 85% | $30.50 |
| 3 Years | $20.00 | 79% | | 3 Years | 100% | $35.88 |
| 4 Years | $20.50 | | | | | |
| 5 Years | $21.00 | 63% - 75% | | Continue through "How Will My Wages Change" table | | |
| 6 Years | $22.00 | Immediate Top Rate | | | | |

*Step increases in the tables above based on achieving 52 weeks worked.

# COLA RESTORED | 15-21

The UAW first negotiated COLA back in 1948 with the purpose of protecting the wages of UAW members against rising consumer prices. COLA remained in place for over 60 years until it was suspended in 2009 due to the Global Financial Crisis.

COLA is calculated quarterly based on changes in the Consumer Price Index ("CPI") published by the U.S. government and is included in your paycheck on a cents per hour basis.

The COLA formula is estimated to generate $1.78 per hour over the term of the CBA. This estimate is based on a 2.4% average annual inflation increase derived from the Wall Street Journal Economic Survey.  Under this scenario, COLA would provide a total value of around $8,800 through the CBA term.

COLA also offers strong protection in the case of extreme inflation like we have seen over the past few years.  For example, under a 5% average annual increase scenario (or 20%+ over the CBA term) our COLA formula would generate $6.25 per hour.

COLA is presented separate from base wages on your paycheck and will increase or decrease based on increases or decreases in the CPI (increases in CPI = inflation, decreases = deflation) but in no circumstance will COLA drop below zero. COLA is included in computing overtime premium, shift/crew premium, all contractual paid time off, and call-in pay. Consistent with the formula suspended in 2009, a 10 cent quarterly diversion is in place to offset healthcare inflation. At the end of the contract, the total amount of COLA generated will be folded into base wages minus five cents.

## TOTAL ECONOMIC GAINS

| | Production at Full Rate | Skilled at Full Rate | In-Progression | GMCH | Lower Tier CCA | Subsystems | Temps Converted |
|---|---|---|---|---|---|---|---|
| Ratification Bonus | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Tool Allowance | | $14,400 | | | | | |
| Value of Wage Increase | $54,900 | $63,300 | $120,800 - $159,700 | $136,100 - $185,000 | $125,300 - $176,000 | $134,900 - $173,400 | $160,700 - $182,300 |
| COLA Estimate | $8,800 | $8,800 | $8,800 | $8,800 | $8,800 | $8,800 | $8,800 |
| Value of Economics Gains | $68,700 | $91,500 | $134,600 - $173,500 | $149,900 - $198,800 | $139,100 - $189,800 | $148,700 - $187,200 | $174,500 - $196,100 |

*Value of wage increases estimated using 2,080 straight-time hours annually. Any overtime would increase the value. Does not include profit sharing. Eligible profit sharing amounts were worth $40,000 over the last four years.

## PROFIT SHARING MAINTAINED

### $5,000 RATIFICATION BONUS

Must meet eligibility requirements.

### For the first time ever, temporary workers will receive profit-sharing.

# RETIREMENT SECURITY

Retirement insecurity is one of the greatest economic injustices facing our country – and our membership. We went into this round of negotiations committed to making huge strides for current and future retirees. We didn't get everything we wanted, but we got more than many thought was possible.

**CURRENT RETIREES & SURVIVING SPOUSES | EX. A 167**
Under this agreement, current retirees and surviving spouses will receive a payment of $500 annually. For decades, surviving spouses received less than retirees – this contract not only re-established annual bonuses for all retirees but provided the same amounts for surviving spouses. Eligible if retired prior to October 1, 2023, with payments in December.

**TRADITIONAL MEMBERS | EX. A 7**
For current traditional members we won a $5 increase to the Basic Benefit which will result in an increase of $1,800 a year to future pensioners. The Company will offer three Special Attrition Programs (SAP) from January 2024 through the life of the agreement of $50,000 lump-sum pre-tax retirement incentive for traditional employees who meet the normal or early retirement eligibility requirements. The Company and the Union will agree on timing, size, and scope of the offering.

**IN-PROGRESSION MEMBERS | EX. G 23**
For current In-Progression members, we won a groundbreaking 10% employer contribution—with no required member contribution—to their 401k. This benefit is capped at 40 hours because our union is fighting hard to ensure that everyone is provided a pathway to a dignified retirement without having to work more than 40 hours a week.

**Annuity | EX. G 114**
In-Progression Members will be given the opportunity to purchase an annuity at a discounted rate with funds from their 401(k).

| IN-PROGRESSION | TRADITIONAL | CURRENT RETIREES |
|---|---|---|
| **10%** | **$5** | **$500** |
| employer contribution to 401(k) | Increase to Basic Benefit | Annual Payments |

## 73% TO 146% INCREASE IN ANNUAL COMPANY CONTRIBUTION TO 401(K)S BY END OF AGREEMENT

**GM Direct Stock Purchase Program | EX. G 106**
Members will be able to purchase GM stock through payroll deductions in the near future.

**Personal Savings Plan | EX. G 10**
Temporary Employees will now be able to make personal contributions to a 401(k) account with 91 calendar days of employment.

**Financial Well Being | EX. G 110**
During these 2023 negotiations the bargaining committee was successful in securing language to continue offering and expanding financial wellbeing services currently offered allowing Members to better prepare for retirement.

9

# WINNING A JUST TRANSITION | 300-302

Plant closures have turned our lives upside down, uprooting our families and communities. It's not about whether or not this transition happens. It's about who gets the profits, and who feels the pain.

In March, 2019, General Motors closed the Lordstown Assembly Plant. Thousands of UAW members had to move, retire, or lose their jobs. For the community, the consequences were devastating. So when GM announced plans to build a new Lordstown plant a couple years later, people thought this could be the opportunity that finally made their families and communities whole again.

In 2022, GM opened Ultium Cells, a joint venture with LG which produces battery cells for electric vehicles. Residents were pitched on a new facility bringing good paying green jobs back to Lordstown. What they found was a far cry from what was promised. These jobs are dangerous, difficult, and pay low wages. Today, the green jobs at Ultium Cells pay a $20 an hour starting rate for production.

All that comes to an end with this agreement.

Upon ratification, Ultium employees will become GM employees and be covered by the UAW-GM National Agreement. Ultium Cells will have a supplemental agreement that covers health and safety and skilled trades.

### LORDSTOWN TRANSFERS
After ratification, there will be a 6 month window for former Lordstown employees who were active at Lordstown Assembly Complex on November 26, 2018 to apply to return to Ultium Cells. Former Lordstown employees who transfer will retain their current wages, benefits, and seniority.

### WAGE SCALE FOR NEW HIRES
All new hires will make a minimum of 75% of the maximum wage rate under the UAW-GM National Agreement. Production workers at Ultium Cells will receive an immediate pay increase of at least $6 to $8 an hour.

| Date of Increase | Minimum Production Wage at Ultium | Minimum Skilled Trades Wage at Ultium |
|---|---|---|
| Ratification | $26.91 | $31.80 |
| Sept. 16, 2024 | $27.72 | $32.75 |
| Sept. 15, 2025 | $28.55 | $33.74 |
| Sept. 21, 2026 | $29.41 | $34.75 |
| Sept. 20, 2027 | $30.88 | $36.49 |





# INVESTMENT | 296-298

The bargaining committee had language put in place that secures investments previously announced by General Motors:

| ELECTRIC VEHICLES & COMPONENTS | |
|---|---|
| **Plant** | **Product Investment** |
| **Orion Assembly**<br>$4 billion investment | Future electric vehicles |
| **Springhill Assembly**<br>$2 billion investment | 2 GM EV's (1 implemented) & future partner EV |
| **Toledo Propulsion**<br>$760 million investment | Drive unit production |
| **Lockport GMCH**<br>$154 million investment | Electric motor stator module |
| **Bedford Casting**<br>$96.7 million investment | Drive unit casting |
| **Warren Technical Center**<br>$81 million investment | Celestiq |
| **Rochester GMCH**<br>$56 million investment | Battery cooling lines |
| **Pontiac Stamping**<br>$40 million investment | Flexible fabrication machining |
| **Defiance Casting**<br>$8 million investment | EV casting cell |
| **Factory Zero** | Future electric full size SUV |

| ICE VEHICLES & COMPONENTS | |
|---|---|
| **Plant** | **Product Investment** |
| **Flint Assembly**<br>$851 million investment | Additional volume capacity & next gen truck |
| **Ft. Wayne Assembly**<br>$687 million investment | Support volume capability & next gen truck |
| **Arlington Assembly**<br>$555 million investment | Support volume capability & next gen large SUV |
| **Flint Engine**<br>$579 million investment | Gen 6 V8 |
| **Marion Metal**<br>$491 million investment | 2 new presses, press lines & die refurbishment |
| **Flint Metal**<br>$233.4 million investment | New dies |
| **Bay City**<br>$216 million investment | Gen 6 V8 parts |
| **Lansing Delta Township**<br>$100 million investment | Next generation SUV |
| **Defiance Casting**<br>$79 million investment | Castings for Gen 6 V8 |
| **Parma Metal**<br>$71.4 million investment | Press upgrades, volume increase & future program |
| **Rochester GMCH**<br>$12 million investment | Gen 6 V8 parts |
| **Bedford Casting**<br>$7 million investment | Additional die casting capability |

## These additional investments were also secured through negotiations:

- Electric Vehicle & Components
    1. Lansing Grand River    $1.25 billion    future electric vehicle
    2. Fairfax Assembly    $391 million    future electric vehicle
    3. Tonawanda Engine    $300 million    drive unit production
- Kokomo - Within 12 months of ratification and through the life of this agreement, sufficient work will be allocated to employ a minimum of 150 people.



Additionally, the Global Vehicle Development Process (GVDP) will continue as the process whereby future facility allocations may be made through the life of the agreement.

**The Right To Strike Over Plant Closures Moratorium And Product And Investment | 259, 298**
For the first time in our union's history, we have won the right to strike over plant closures and product and investment. These product commitments are backed up by the power of the strike threat. That's the strongest tool we have to protect our jobs, our families, and our communities.

**Honoring Picket Lines | 311**
It will not be a violation of the agreement if a member refuses to cross a picket line. If a member refuses to cross a union sanctioned picket line, there will be no discharge or discipline provided the member believes that crossing the picket line would endanger their health and safety.





# RECORD CONTRACTS
# RECORD PROFITS
*EQUAL*
# RECORD RECORD

## VALUE OF GAINS IN TENTATIVE AGREEMENT

Value of gains in 2023 TA worth more than 4X value of gains in 2019 CBA

More in raises than past 22 years combined.

2023 TA

VS.

2019 CBA

Some lower tiered workers at GMCH get up to

**89%** Raise Immediately

Some lower tiered workers at CCA get up to

**79%** Raise Immediately

Current GM Temps Get



**158%** Raise Through 2023 Agreement

Current GM temps with 90 days get between a

**51 – 61%** raise immediately upon ratification, depending on years of service.





All Wage Increases from 2001–2022

**23%**

Wage Increases in 2023 GM Agreement

**25%**



Top Wage Will Increase About

**33%**

Through 2023 GM Agreement

Starting Wage Will Increase About

**70%**

# SKILLED TRADES

## Tooling Allowance $1.50/ hour tooling allowance folded into rate upon ratification | 8

The national negotiating committee was successful in attaining a special one-time increase of $1.50 per hour that will be added to the base rates of skilled tradespersons. The increase will be applied upon ratification of the tentative agreement after the general wage increase of 11% for 2023.

### Layoff | 49
Skilled Trades on Layoff (ILO) will not be forced into production jobs.

### Doc. 86- Skilled Working in Production renewal | 229-232
Within 120 Days of the effective date of the 2023 UAW-GM National Agreement, the National Parties will establish an application period for Skilled trades employees that are currently working production to express their desire to receive an offer to fill skilled trades openings by submitting application to their Local Apprentice Committees.

### Employee Referral Programs | 372
The National Parties agreed to develop a process for UAW-GM employees to refer external Skilled Trades candidates for open Skilled Trades positions.

### Elimination of the MOUs regarding the Tool & Die Maker Classification | 368
Skilled Trades members who have a UAW Tool & Die Maker Journeyperson card or have a UAW-GM Tool & Die Maker certificate of completion of apprenticeship can apply for transfer into a Toolmaker or Die Maker opening and will maintain their Tool & Die Maker Skilled Trades Date of entry.

### Improvements to the STARC program | 222-223, 362-364
- The STARC readiness lists will be refreshed bi-annually and published no later than March 1st and September 1st of each year.
- Reimbursement for STARC courses will occur 90 days after being indentured.
- Increased apprenticeship offers for all UAW-GM STARC readiness candidates.

### Two Year Requirement waived for all Apprentices indentured in 2017, 2018, and 2019 | 374
The UAW Bargaining Team was successful in negotiating the removal of the two (2) year requirement of the Apprentice Training Agreement for all apprentices indentured in 2017, 2018, and 2019. This enables these Electrical Apprentices to leave the company without repayment obligations after meeting the two (2) year requirement after completing on-the-job hours to become an in-plant journeyperson.

### Increase to Meals Expense for Apprentices | 361
Apprentices will be able to expense their meals on a GM Corporate Credit Card consistent with the GM travel and Expense Policy.
- Daily expenses increased to up to $75 per day.
- Daily required receipts to mirror GM policy.

### Elimination of the MOU for the SSO classification at the Engineering facilities | 370-371
Within 120 days of the effective date of the 2023 UAW-GM National Agreement, the National Parties, with the assistance of the Local Apprentice Committees, will establish an application period for current SSOs and former SSOs with recall rights to receive an offer to transition to an open skilled trades job as a Journeyperson-in-Training (JIT).

### Doc. 63-Apprentice Training & Journeyperson Development Strengthened | 224-226
The UAW was successful in changing the language in Doc. 63. Apprentices will be indentured using a new formula. The formula will use the number of Journeypersons who are sixty-one (61) years of age or older as of January 31, 2024, in all apprenticeable trades throughout UAW-GM facilities, to calculate the number of apprentices owed. This new formula will result in the placement of six hundred fifty (650) new apprentices during the life of the 2023 National agreement.



# WORK LIFE BALANCE

**Vacation | 116**
All employees with 20 years or more of service are eligible for 200 hours of vacation.

**Vacation Approval | 37**
The company has agreed that all vacation applications will be returned within 3 days. The only exception is those made during the February Vacation Application Period.

**Paid Parental Leave | 275**
Effective January 1, 2024, eligible members may be provided up to 2 weeks of paid time off for a leave of absence for birth, adoption, surrogacy, or foster care situations.

**Holidays | 38**
Juneteenth added as a paid holiday.

**Bereavement | 45**
Time off for grandchild and current spouse's parent increased from 3 to 5 days.

**Work Life Balance | 318**
A Committee will be formed to explore and discuss work life balance issues aiming to improve work life balance for members.

# HEALTH & SAFETY

## Document 46 Industrial Hygiene/ Ergonomics Representative | 339, 350-351
Sprains and strains are the most common recordable injury affecting our membership. Your negotiations team was successful in negotiating a DOC.46 IH/ERGO alternate representative. This new position will provide the membership with additional resources to improve our ergonomics and Industrial Hygiene programs, to provide more coverage on the shop floor and keep the membership safe. In addition to functioning in the absence of the IH/JETT, the alternate will be utilized during periods of launch as an extra resource.

## Ergonomic Program Enhancements | 339
During these negotiations, the parties discussed future ergonomic enhancements to the UAW-GM Ergonomics process. The Joint Parties agree: to develop or update a new Risk Factor Checklist
- to utilize the latest version of jointly approved secondary tools
- to create external competency training
- to make additional future revisions of the Technological Ergonomic Database with Joint input
- to update existing Ergonomic training and identify future program enhancements
the plant population to qualify for a full time IH/JETT was reduced from 750 to 500 in an effort to reduce strains and sprains

## New IH and Ergo Equipment | 338
In addition to the improvements to the ergonomics program, the union made the company aware that the current IH and Ergo equipment being utilized by the JET/IH representatives are increasingly becoming inoperable and/or obsolete. The Parties will jointly survey all UAW-GM represented sites to determine the availability and condition of this equipment and the National Joint Committee will determine the equipment that needs to be replaced/ updated and provided by the company. It is agreed that it is the responsibility of each site to maintain jointly supplied equipment.

## National Standards Committees | 346
Standards in Health and Safety are constantly changing. Many Companies including General Motors have membership on committees that create and update consensus standards. It is agreed upon that the National Joint Committee on Health and Safety will identify applicable standard sub-committees to participate in and jointly select representatives for those committees.

## High-Risk Tasks | 349
Whenever a high-risk task is scheduled to be completed a member of the Local Joint Health and Safety will be on-site.

## Improvements to site Active Shooter process | 335
Aware of the world we live in, the bargaining team solidified language regarding workplace violence. Within 90 days of ratification the National Joint Committee will review the current policies to benchmark improvement opportunities at all GM sites.

## Gate Pass | 337
As our worksites become more diverse so do the people that visit our worksites. Contractors, Truck Drivers, Expeditors and Vendors are increasingly more diverse and for many English is a second language. To make sure that all visitors understand the rules that keep our membership safe, The Joint Parties agreed to explore the utilization of QR Codes on safety signage and documents that supports different languages for review before entering our worksites.

## Health and Safety Conferences and Training Seminars | 340
During these negotiations, the parties discussed the existing agreements and practices regarding Joint Health and Safety Conferences and training seminars. A Joint Health and Safety Conference will be held biannually, a training seminar will be scheduled during the years when no conference is scheduled. The parties agree that this innovative approach will provide a robust learning experience for our UAW-GM Health and Safety Professionals.




### EV Safety | 343-344
A new performance standard (PS-24) was developed for the Workplace Safety System to ensure common workplace safe practices at all sites handling Lithium-Ion batteries.

### Fall Hazard | 336
Due to recent updates of government, manufacturer and consensus guidelines, some fall hazard equipment may no longer be in compliance. A joint document for addressing new or existing anchorage points based on updates to UAW-GM PSO3, will be published. The company agrees that the required inspections of training towers and permanent anchorage points will be completed in accordance with all related guidelines.

### Joint Company Research Funding | 137-138
Protecting the health and safety of our membership not only includes our efforts in implementing safety programs at our worksites, and creating a safety culture, but also includes occupational health and safety research. These negotiations resulted in the UAW securing a commitment from GM to be part of a joint auto company research project. Within 90 days of ratification, the parties will develop a research agenda in the following areas:
- Isocyanates.
- Accident prevention to eliminate fatalities.
- Industrial hygiene sampling, exposure assessments and medical surveillance.
- Breast cancer prevention.
- Opioid use disorder intervention.

### DURATION & RATIFICATION
The terms of this proposed agreement will not take effect until the tentative agreement is ratified by a majority of UAW members at GM, and only then on the appropriate dates specified. The new agreement, if ratified, will run for four years and nine months and will expire April 30, 2028.

### DUES: A CONSTITUTIONAL MATTER
Dues are determined by UAW Constitutional Convention action and are not a subject of negotiations. Dues are based on the principle that they reflect each member's cash income, normally 2.5 hours of straight-time pay per month. Lump-sum cash payments are subject to dues because they also represent cash income and are assessed at the rate of 1.44%, which is equivalent to 2.5 hours of straight-time pay per month.

### UAW GM HOURLY
This report is based on the tentative agreement negotiated by the UAW 2023 National Negotiating Committee. This is a summary of the tentative agreement. In all cases actual contract language will apply.

# EMPLOYEE PLACEMENT & TRANSFERS

## Special Transfer Opportunity: Members on a Formal Leave of Absence | 326-327
Modification was made to the Appendix A language that allows members, Production and Skilled Trades, who are on a formal leave of absence with no company-paid benefits to apply for Appendix A transfer opportunities of their choosing.

## Appendix A: Application Period | 320
The Appendix A Application Period for Posted transfer opportunities will reduce from 10 days to 7 days.

## Hardship Transfer Opportunity | 322
The Union and company agreed to language that allows member to make application to transfer due to a temporary Hardship. Approval will be limited to members that need to care for an immediate family member with serious illness or imminent death. Final determination will be based off the medical information provided from the patient's attending physician and the Company's Corporate Medical Department.

## Married Couples | 328
During negotiations the Union and company solidified language allowing married couples and unmarried couples with children selected for transfer to be de-selected when only one member is selected to fill a job transfer opportunity. Both members must make application to invoke this special consideration.

## Area Hire | 323
An agreement has been made to include Fort Wayne in the Area Hire for Kokomo GMCH.

## Skilled Trades Appendix A Transfer Eligibility for GMCH Facilities | 106-107
The Union and company agreed to allow skilled trades members at GMCH and GM plants to be eligible to transfer to posted job openings at both GMCH and GM under the provisions of the UAW-GM National Agreement.

## Relocation Allowance | 4-6, 325
Your Bargaining Team negotiated an increase in the Relocation Allowance paid to members when transferring to other locations in the Extended Area Hire. The new amount is as Follows: Option-1 Enhanced Relocation Package: $37,500 Members will not be expected to pay back any portion of the signing bonus if the company cancels a Transfer Opportunity after the signing bonus has been paid out.

## 2 Year Seniority Requirement for Transfer | 48
Members with less than two years seniority will be eligible to transfer via Appendix A within their area hire.

# SUPPLEMENTAL UNEMPLOYMENT BENEFITS (SUB)

The UAW was successful in getting SUB weeks fully replenished. Any employee who used SUB during the life of the 2019 agreement will have their SUB weeks fully replenished once employee returns to work.

## SUB In-Progression and Traditional | EX. D 26
With 90 days of service, you will receive 52 weeks of Sub then 52 weeks of TSP (Transition Support Program) and 24 months of continued health coverage.

## SUB Pay eligibility 90 days including Temps | EX. D 6-7
Full time temps with 90 days will receive short work week benefits and temporary layoff benefits.

# BENEFITS

## IMPROVED. EXPANDED. PROTECTED

**No Increases to Co-Pays/Deductibles or out of pocket cost | EX. C**
All current co-pays and deductibles have been maintained.

**Health Care Day 1 | EX. C 35**
Health Care coverage will now start on the date of hire for all new hires.

**Health Care Continuation 24 months | EX. C 38**
All Traditional and In-Progression members get healthcare on layoff for up to 24 months

**$1 per Hour Worked for Post-Employment Healthcare**
Maintained the $1.00 per hour for post-employment Healthcare.

## EXPANDED AREAS OF COVERAGE

**Chiropractic Coverage | EX. C 164 PLUS A**
Chiropractic Coverage is now a covered benefit and will allow for 24 spinal manipulations.

**Allergy Testing is now covered | EX. C 127**
Allergy Testing will no longer be an excluded benefit.

**Lasik benefit increase | EX. C 208**
The amount was increased to $350 and now also provides those Members who may still require corrective eyewear the ability to utilize the benefit 12 months after surgery.

**Frames once per calendar year | EX. C 209**
New frames are now covered annually, not every other year.

**Fertility Treatments | EX. C 164 PLUS B**
Never before a covered benefit, now a total of $5000 combined annual benefit.

**Dental Allotment | EX. C 196**
Increased from $1850 to $2000

**Sick Leaves of Absence | EX. B 23**
Nurse Practitioners, Physicians Assistants and Midwives (birthing purposes) will now be able to provide certification for sick leaves.

## DEPENDENTS

**Work Related fatality coverage for Dependents | EX. C 47**
If a Member loses their life as a result of a work related injury, dependents will be covered up to age 26.

**T&PD Children Coverage | EX. C 54**
Adjusted the Total & Permanent Disabled (T&PD) Children Coverage beyond age 26 if the member's dependent child becomes T&PD prior to the end of the calendar month in which the child turns age 26.

**Memorialized age 26 provisions of the ACA | EX. C 52-55**
This is to protect the members if our government changes laws to PPACA. Member's dependents will be covered under company healthcare

**Disability Appeal and IMO | EX. B 110, 147**
The UAW was successful in streamlining and strengthening the disability appeal process for a member including getting an Independent Medical Opinion (IMO)/Independent Medical Examiner (IME) for any member that has been discharged prior to concluding their appeal process.

**Extended Disability Benefits In-Progression | EX. B (20) (21)**
In-Progression Members will see an increase in duration in which they can receive EDB, 1 year seniority will now allow for up to 10 years or age 65.

**Medicare Part B | EX. C 336**
The premium will be reimbursed for medicare part B active members.

**Travel Benefit | EX. C 164**
Members will be able to receive travel and lodging expenses up to $2000 annually for covered medical expenses or under IRS Code Section 213(d) in the event no network provider is available within 150 miles of the member's primary address and virtual care is not an option.

# Education & Training

**Training | 101-105, 358-359**

Your committee's commitment to enhance and maintain full involvement in all aspects of current and future training designated for UAW members was successful in this round of bargaining.  The UAW-GM Joint Skill Development and Training Committee will review all Joint Programs courses used by the UAW-GM Membership to evaluate the effectiveness of technology, objectives and materials used in these courses.

This committee will also look at the feasibility of providing Train the Trainer (T3) training for current and new technologies at the facility described in MOU Joint Activities or other jointly agreed to locations.  Any company changes to the training plan administration system or any correlating applications will now be jointly reviewed. Joint subject matter experts from UAW represented facilities will form a training plan administration system advisory committee to address common system issues, assist with testing and review updates when implemented.

**Tuition Assistance Program | 108-112**

Going into this round of bargaining your negotiating team made it known that the rising cost of education was a concern for our members that wish to continue their education. With great persistence, significant gains to TAP benefits were made not only for full time workers but also for full time Temporary employees with at least 90 days of continuous service.  All employees with 90 days of service full time or temporary qualify for TAP benefits.  Qualifying members are now eligible for up to $8000.00 per year for degreed courses at regionally accredited colleges or universities. That is an increase of $3000.00 per year. Annual amounts for job related and personal enhancement courses were increased as follows:
Job Related courses - $4000.00 (annual increase of $1800.00)
Personal Enhancement courses - $1500.00 (annual increase of $50.00)

**Tuition Assistance Program for Laid off members | 108-112**

TAP benefits for laid off workers who have at least one year of seniority as of the last day worked prior to layoff have also increased.

| Seniority as of date of layoff | |
|---|---|
| 1-3 years | $7400 |
| 3-4 years | $8400 |
| 4 or more years | $9400 |

**Other improvements within the TAP program | 108-112, 356**

- Surviving Spouses and dependents of a deceased active seniority employee will now be able to utilize the remaining balance of the deceased TAP allotment for the life of the agreement for degreed related courses.
- Within 90 days of ratification, the joint parties will jointly update the appeal process for maintaining active TAP status when an employee fails a course, including STARC program related courses.

**UAW Scholarship Program for Dependent Children will be established | 279-281**

The bargaining committee was able to restore the benefit lost in 2009.  Dependent children of active UAW-GM represented employees who are pursuing post-secondary education or training at an institution accredited by a governmental or nationally recognized agency will be eligible for an annual maximum benefit award of $1600.00.





# GMS

### Team Concept in CCA | 329
The parties agreed that GMS is the single system to be used in all UAW represented sites. This includes the adoption of team concept at CCA locations including establishing Team Leaders and Principle Basketweave Teams.

### VPAC | 334
Your negotiators were successful in securing enhancements to the VPAC (Vehicle Promotions Assistance Contact) process to include electronic tools to assist customers, promote our union-built products and protect personal information.

### People Recognition | 332
The parties agreed to honor our members innovative ideas with the creation of a new "People Make Quality Happen" recognition event.

### GMS Doc. 46 training pilot | 333
The negotiating team secured the development of a pilot project to train GMS Doc. 46 representatives in the "leaders as calibrators" process to enhance their understanding of calibrations and assessments.

# ADAPT | 352-353

### Improved communications
New mandatory quarterly calls between plant level ADAPT Representatives and the National ADAPT Team will create a more consistent application of the ADAPT process, resulting in better opportunities for individuals with disabilities or restrictions.

### Training
Agreement by the joint parties to conduct a total review of Roles and Responsibilities, Implementation Guide, and Training Materials as well as increased mandatory training will ensure every individual with restrictions will have their circumstances properly reviewed and the best opportunities for work being provided.

### Meetings
The bargaining committee negotiated mandatory meetings to review all No Jobs Available Within Restriction (NJAWR) and provide members with the opportunity to return to work as quickly as possible.

### Process Review
Newly negotiated "Process Reviews" will streamline resolution process when issues are identified, as well as provide for the sharing of "Best Practices" to all locations. These process reviews will also provide the National ADAPT Team the opportunity to make strong recommendations regarding the required handling and storage of confidential information used in the ADAPT Process.

# WORK FAMILY | 197-206, 357, 381-383

**Enhancements**

To better serve the needs of UAW members and their families at General Motors the Bargaining Committee won important victories in our Work Family Program. The parties reaffirmed the importance of maintaining confidentiality and reinstated Document. No. 39, (Memorandum of Understanding Employee Assistance Program) and Document No. 37, (Resource and Referral Services).  It was agreed that Work Family Awareness training will be available to the workforce, along with including Veteran Services resources.

Childcare and Eldercare resource will be made available in the updated Policy and Procedure Manual along with a piloted on-site assessment for the Work Family Representatives. Your bargaining committee was also successful in maintaining Annual Professional Development for Doc 46. Work Family Reps.

# DIVERSITY | 354

**Commitment to Diversity Renewed**

The diversity program is a critical piece of our Union's commitment to having a workplace free from hostility and harassment. Negotiators won language that recognizes that a proactive approach can potentially avoid problems. Annual Diversity Training will be provided for members of the Equal Application Committee along with T3 training.  In addition, diversity training will continue to be available in New Employee Orientation.

**Vehicle Voucher | 315**
$1,500 non-transferrable vehicle voucher for the purchase of a new GM vehicle in 2024.

**Bonus Taxes | 313**
All bonuses will be paid in regular weekly paychecks but will be taxed separately from regular earnings.

**Document 8 | 165**
Members in steps 4 and 5 of the process will now be allowed to use VR time without pre-approval. All members will have the last step removed from their record.

**Joint Activities | 81-100**
The Joint Activities Trust Funds to be funded for the life of the agreement.

**Severe Weather Letter | EX. D 133 PLUS A**
The UAW was successful in strengthening the language around the weather letter pertaining to Short Work Week (SWW) for severe weather and the 40% threshold required.

**Legal Services | 287-289**
The UAW was successful in continuing to provide the necessary funding to maintain the Legal Services Plan as well as now allowing Temporary Employees the opportunity to use the benefit. If you leave the company you will be able to finish a case you have started.



# 84 HOLIDAYS OVER FOUR AND A HALF YEARS

**Holiday Added | 43A-44A**

Your bargaining team won Juneteenth as an additional paid holiday. A total of eighty-four (84) holidays will be provided to UAW GM during the proposed agreement. All existing holidays are maintained. When a holiday falls on a Saturday it will be observed on the preceding Friday. When it falls on a Sunday it will be observed the following Monday.

### 2023-2024

| Date | Holiday |
|---|---|
| Nov. 10, 2023 | Veterans Day Observed |
| Nov. 23, 2023 | Thanksgiving |
| Nov. 24, 2023 | Day after Thanksgiving |
| Dec. 25, 2023 | |
| Dec. 26, 2023 | |
| Dec. 27, 2023 | **Christmas** |
| Dec. 28, 2023 | **Holiday** |
| Dec. 29, 2023 | **Period** |
| Jan.  1, 2024 | |
| Jan. 15, 2024 | Martin Luther King Jr. Day |
| Mar 29, 2024 | Good Friday |
| April 1, 2024 | Day after Easter |
| May 27, 2024 | Memorial Day |
| June 19, 2024 | Juneteenth Day |
| July 4, 2024 | Independence Day |
| July 5, 2024 | Day after Independence Day |
| Sept. 2, 2024 | Labor Day |

### 2024-2025

| Date | Holiday |
|---|---|
| Nov.  5, 2024 | Federal Election Day |
| Nov. 11, 2024 | Veterans Day |
| Nov. 28, 2024 | Thanksgiving |
| Nov. 29, 2024 | Day after Thanksgiving |
| Dec. 23, 2024 | |
| Dec. 24, 2024 | |
| Dec. 25, 2024 | |
| Dec. 26, 2024 | **Christmas** |
| Dec. 27, 2024 | **Holiday** |
| Dec. 30, 2024 | **Period** |
| Dec. 31, 2024 | |
| Jan.  1, 2025 | |
| Jan. 20, 2025 | Martin Luther King Jr. Day |
| April  18, 2025 | Good Friday |
| April  21, 2025 | Day after Easter |
| May 26, 2025 | Memorial Day |
| June 19, 2025 | Juneteenth Day |
| July  4, 2025 | Independence Day |
| Sept. 1, 2025 | Labor Day |

### 2025-2026

| Date | Holiday |
|---|---|
| Nov. 11, 2025 | Veterans Day |
| Nov. 27, 2025 | Thanksgiving |
| Nov. 28, 2025 | Day after Thanksgiving |
| Dec. 24, 2025 | |
| Dec. 25, 2025 | |
| Dec. 26, 2025 | **Christmas** |
| Dec. 29, 2025 | **Holiday** |
| Dec. 30, 2025 | **Period** |
| Dec. 31, 2025 | |
| Jan. 1, 2026 | |
| Jan. 2, 2026 | |
| Jan. 19, 2026 | Martin Luther King Jr. Day |
| April 3, 2026 | Good Friday |
| April 6, 2026 | Day after Easter |
| May 25, 2026 | Memorial Day |
| June 19, 2026 | Juneteenth Day |
| July  3, 2026 | Independence Day Observed |
| Sept. 7, 2026 | Labor Day |

### 2026-2027

| Date | Holiday |
|---|---|
| Nov. 3, 2026 | Federal Election Day |
| Nov. 11, 2026 | Veterans Day |
| Nov. 26, 2026 | Thanksgiving |
| Nov. 27, 2026 | Day after Thanksgiving |
| Dec. 24, 2026 | |
| Dec. 25, 2026 | |
| Dec. 28, 2026 | **Christmas** |
| Dec. 29, 2026 | **Holiday** |
| Dec. 30, 2026 | **Period** |
| Dec. 31, 2026 | |
| Jan.  1, 2027 | |
| Jan. 18, 2027 | Martin Luther King Jr. Day |
| Mar. 26, 2027 | Good Friday |
| Mar. 29, 2027 | Day after Easter |
| May 31, 2027 | Memorial Day |
| June 18, 2027 | Juneteenth Observed |
| July 5, 2027 | Independence Day Observed |
| Sept. 6, 2027 | Labor Day |

### 2027-2028

| Date | Holiday |
|---|---|
| Nov. 11, 2027 | Veterans Day |
| Nov. 25, 2027 | Thanksgiving |
| Nov. 26, 2027 | Day after Thanksgiving |
| Dec. 24, 2027 | |
| Dec. 27, 2027 | |
| Dec. 28, 2027 | **Christmas** |
| Dec. 29, 2027 | **Holiday** |
| Dec. 30, 2027 | **Period** |
| Dec. 31, 2027 | |
| Jan. 17, 2028 | Martin Luther King Jr. Day |
| April 14, 2028 | Good Friday |
| April 17, 2028 | Day after Easter |

# THE NEGOTIATIONS PROCESS

## WHO'S WHO



**UAW National GM Council:** Elected local leadership at UAW-represented GM facilities represent members' interests on the National Council.

**UAW National GM Sub-Councils:** National GM Council broken down into departments or divisions (i.e. Skilled Trades, Assembly, CCA).

**UAW National Negotiators:** Local UAW leadership elected within each Sub-Council whose role is to negotiate the national contract.

**Negotiations Sub-Committee:** Made up of UAW National Negotiators and the UAW National GM Department. Sub-Committees are broken down by subject matter.

**UAW National Resolutions Committee:** Local UAW Leadership elected with each Sub-Council whose role is to oversee and organize resolutions received from the membership.

**UAW National GM Department:** International UAW Staff assigned to GM.

## TIMELINE



**10.10.22**
UAW National Resolutions Committee and National Negotiators are elected in Atlantic City, NJ.

**10.11.22**
Letter sent to local UAW leadership from UAW National GM Department requesting membership resolutions.

**3.13.23**
UAW National GM Sub-Councils meet in Detroit to approve membership resolutions from their facilities.

**3.27.23**
UAW Special Bargaining Convention is held in Detroit.

**4.17.23**
UAW National Resolutions Committee meets in Detroit and organizes the approved resolutions into the 2023 Collective Bargaining Proposals Book.

**4.24.23**
UAW National Negotiating Committee meets in Detroit for negotiations preparation and National GM Department reports.

**5.23.23**
UAW National GM Council meets in New Orleans, LA and votes to approve resolutions. Resolutions then become demands for negotiations.

**7.11.23**
Membership demands are complied with UAW National GM program demands and assigned to the appropriate sub-committee.

**7.17.23**
Opening Ceremony, AEB GM Tech Center – the official kick-off of the 2023 National Negotiations.

**7.18.23**
Negotiations begin in sub-committees. Each piece of language negotiated is reviewed and approved by all UAW National Negotiators.

**8.21.23**
Strike authorization voting begins at UAW locals and ended on Thursday 8.24.2023

**9.15.23**
2019 UAW GM CBA expires.

# GENERAL MOTORS DEPARTMENT STAFF
## Mike Booth, Vice President and Director

Dave Shoemaker
Administrative Assistant

Nicole Current
Top Administrative Assistant

Mike Plater
Administrative Assistant

Todd McDaniel
Assistant Director

Leo J. Skudlarek II
Assistant Director

Jason Beardsley
Assistant Director

Chris Gallagher
Assistant Director

Jeff Walker
Assistant Director

## UAW GM NEGOTIATING COMMITTEE

| Sub-Council | | Local | Sub-Council | | Local |
|---|---|---|---|---|---|
| 1 | Arniece Stephenson | 1753 | 3 | Rob Egnor | 211 |
| 2 | Wiley Turnage | 22 | 3 | Nick Capone | 1097 |
| 2 | Eric Welter | 598 | 4 | Ed Smith Chairperson | 659 |
| 2 | Doug Bias | 31 | 5 | Earl Fuller Jr. Recording Sec. | 160 |
| 3 | Tony Mann | 668 | 5 | Kenny Hines | 276 |
| 3 | Jeff King Vice Chairperson | 14 | | | |

## COORDINATORS

Andrea N. Morrow
Sean D'Angelo

Dave Matthews
John Szafranski
Amie Coville

Dan Reyes
Monica M. Bradford

## STAFF

Derik Jewell
Candice Morrison
Dewitt "Mac" McGowan Jr.
Scott Lubaczewski
Sean Nagoda

Matt Collins
Joanna Bonner
Shawn Cook
Mia Carr

Michael Cox
Brian Fredline
Chris Webb
Steve Gajewski

Rick Toldo III
Matt Slade
Dwayne "Hawk" Hawkins
Barry Campbell

## ADMINISTRATIVE STAFF

Della Turner

Mary Leak

Gina Brugilo

## PRESIDENT'S OFFICE STAFF

Chris Brooks
Top Assistant

Paul Caucci
Top Assistant

Jason Wade
Top Assistant

Benjamin Dictor
Counsel

Bill Karges
Associate General Council

James Britton
Associate General Council

Jeff Dokho
Research Director

Matt Uptmor
Administrative Assistant

Renee Turner-Bailey
Social Security Director

Jonah Furman
Communications Director

Max Fazeli
Assistant Director

Bob Mikulan
Assistant Director

Rob Sciotti
Benefits Rep

# 2023 UAW GM NATIONAL NEGOTIATING TEAM



This is the UAW GM National Negotiating Committee whose determined efforts, along with those of the UAW National GM Department, and other UAW staff, produced this tentative agreement. **Shawn Fain i**s the President of International Union, UAW; **Mike Booth** is Vice President and Director of the UAW National GM Department; **Nicole Current** is the Top Administrative Assistant to Booth; **Chris Brooks, Paul Caucci** and **Jason Wade** are Top Administrative Assistants to Fain; **Benjamin Dictor** is Counsel; **Mike Plater** is Administrative Assistant UAW GM Department; **Dave Shoemaker** is Administrative Assistant UAW GM Department; **Jeff Dokho** is Director of the UAW Research Department; **Renee Turner-Bailey** is Director of the UAW Social Security Department; **Todd McDaniel** is Assistant Director UAW GM Department; **Ed Smith** is Chairperson, Local 659 Subcouncil 4; **Jeff King** is Vice Chairperson, Local 14 Subcouncil 3; **Earl Fuller Jr.**, is Recording Secretary, Local 160 Subcouncil 5; **Doug Bias Jr.**, Local 31 Subcouncil 2; **Tony Mann**, Local 668 Subcouncil 3; **Wiley Turnage**, Local 22 Subcouncil 2; **Rob Egnor**, Local 211 Subcouncil 3; **Nick Capone**, Local 1097 Subcouncil 3; **Arniece Stephenson,** Local 1753 Subcouncil 1; **Eric Welter**, Local 598 Subcouncil 2;  **Kenny Hines**, Local 276 Subcouncil 5; **Takiesha Hilliard**, Local 598 UAW GM Subsystems Council; **Jimmy Woodward**, Local 5960 GM Subsystems Council; **Leo Skudlarek II** is Assistant Director UAW GM Benefits Department; **Jason Beardsley** is Assistant Director UAW GM Health and Safety Department; **Chris Gallagher** is Assistant Director UAW GM Work Family, ADAPT and Training Departments; **Jeff Walker** is Assistant Director UAW GM GMS Department; **Dave Matthews** is Coordinator UAW GM Department; **Dan Reyes** is Coordinator UAW GM Employee Placement Department; **Monica Bradford** is Coordinator UAW GM Work Family Department; **Dwayne Hawkins** International Servicing Rep UAW GM Department; **John Szafranski** is Coordinator UAW GM Training Department

August 25, 2020

General Counsel
National Labor Relations Board
Attn: Office of Appeals
1015 Half Street SE
Washington, DC  20570-0001

Re: 08-CA-248781 GENERAL MOTORS &
    08-CB-248782 UAW Local 14

To Whom it May Concern:

After reading Section 8(b)(1)(A) of the National Labor Relations Act, I am confused!  I am not confused, so let me get straight to the point.  Failure to Represent lead to my first question.  Does being **"PRESENT"** (in attendance) equal **"REPRESENTATION"** (participation, engaging)?

1.) In September 2019 I filed complaints against General Motors (08-CA-248781) and UAW Local 14 (08-CB-248782).  My case was assigned to LerVal M. Elva, Field Attorney.  I met with LerVal on October 9, 2019.  Why was she removed from my case?  Was she incompetent?  Maybe a white woman, Catherine A. Modic, would have a better chance to investigate my concerns!  Even better a white man, Noah Fowle, would be even better investigating my claims more fairly than LerVal and/or Catherine!  Is this a racially motivated power move?  I believe that is a fair question!

For some reason our country, just do not get it!  How many members of the UAW International Body, including the former President, were indicted on Federal Charges?  Does the corruption stop there?  No, it does not because history has shown us that it does not stop with just one individual.  Question!  How many kids' lives had to be ruined from molestations of Priest and University Doctors to protect the **GOOD NAMES AND WORK OF PENN STATE, MICHIGAN STATE OR THE CATHOLIC CHURCH**?  How many employees' lives had to be ruined so that Corporations and Organizations can protect their **"PROFIT MARGIN"** or for the **INDIVIDUAL ACCOMPLISHMENTS OF GENERAL MOTORS MANAGEMENT AND/OR THE UAW OFFICIALS** to move up the management chain?  How many black lives must be taken before our nation does something about gun control and police brutality?

I agree, this is not the correct forum to discuss the above subject matter.  However, they all have the same fundamental flaws as this appeal process.  They are allowing racism, discrimination, social and economic hardship along with despair.

2.) **Case 08-CA-226332** and **Case 08-CB-226329** both investigated by Catherine A. Modic.  First, not one single statement was said or mentioned about a **MOU "RE: RECALCULATION OF WAGE PROGRESSION"**.  The issue of 52 weeks worked would not have been discovered on **March 4, 2016**.  How could it, nobody got raises during that period, if they did, none of them were **"INPROGRESSION EMPLOYEES"**.  That is the employees that this **"MOU"** was supposed to address.  The first new hires were May 30, 2016 with a seniority date of 02/29/2016.

3.) This **"MOU"** document is not *__AUTHENTIC__*.  The document is labeled "*__EXHIBIT C__* ", in the 2015 CBA, *__"EXHIBIT C"__* refers to the Health Care Program.  If it refers to anything different, it further shows its authenticity

4.) The **"MOU"** did not even reveal itself during my **2018 Civil Rights** investigation nor did it surface during my **2018 NLRB** investigation following the filing of **grievance #09040** dated 04/24/2018.*

5.) The **UAW** made no mention of this **"MOU"** existence prior to 2019. It surfaced on the heels of my 2019 <u>grievance #09092</u> filed and dated 03/12/2019.* On April 25, 2019 from a response to my 2019 filed Civil Right complaint against the **UAW**, Sandra Harris from the **UAW** Civil and Human Rights Department was the first to claim it existence.

6.) Conveniently, **General Motors** made the same exact discovery to this so called **"MOU"** on May 2, 2019 with a response from Corey Donavan Tracey from the office of Jackson Lewis P.C.

If I were truly represented and/or accurately represented or any other variance of representations all these issues regarding 52 weeks worked would have been presented, solved, and settled in 2018. Wouldn't you agree?

7.) <u>Case 08-CB-205322</u> was investigated by Noah Fowle.

I am not going to spend a lot of time breaking down Case 08-CB-205322. It really comes down to a few points that I believe are critical. First, during all the suspensions and grievances during 2016, one key element is missing. My right to due process. Your investigation says that because of the CBA due process is void. May I remind you of three names: Shaana Gordon, Warren Charley and Elisabeth Booth just to start.

This 52-work week spreadsheet! General Motors is a Billion Dollar a Year Organization, yet their evidence in this case does not have a name, employee ID, etc. The spreadsheet is not even formatted let alone an official document. Asking for another union representative is not a shop rule violation. Listen to the audio **(AUDIO 01)**, I accounted for every second of my time in October. What about due process? Do I have the right to challenge those who have made claims against me? Can the UAW or General Motors show any claim that the grievance process is a live and vibrant thing? With today technology, that should not be a problem at all. Yet, grievances disappear like the second hand of a watch. All these questions would have been answered with true representation.

I would love to question Chris Hunt, Robin Marr, Jeremy Spawn, Kurt Swade, Bill Wynn, Todd McDaniel, Chad Cattell, Mike Grimes, Clayton Phillips, Ryan Sells, Wendy Holder, Sharita Edge and Andrea Jones.

In closing I would like to say that grievances #09092 and #09040 speaks volumes when it come to representing. Have you read paragraphs 98 and 99 in the 2015 National Agreement? Unfortunately, the 2011 and 2019 CBA do not apply.

Sincerely,

*Shawn L. Liggons*

Shawn L. Liggons

Cc: Frank Landry, Attorney

Enclosure (s)

*** Clearly states "has not met the requirements to satisfy para. 98 & 99 of the National Agreement."**



**UNITED STATES GOVERNMENT**
# NATIONAL LABOR RELATIONS BOARD
**OFFICE OF THE GENERAL COUNSEL**
Washington, DC  20570

September 29, 2020

FRANCIS J. LANDRY, ESQ.
WASSERMAN, BRYAN, LANDRY
& HONOLD, LLP
1090 W S BOUNDARY ST STE 500
PERRYSBURG, OH 43551-5286

Re:   United Automobile, Aerospace Workers of
America, Local 14 (General Motors)
Case 08-CB-248782

Dear Mr. Landry:

Your appeal from the Acting Regional Director's refusal to issue complaint has been
carefully considered. The appeal is denied substantially for the reasons in the Acting Regional
Director's letter of August 4, 2020.

There is insufficient evidence to establish that the Union violated the National Labor
Relations Act. Instead, the evidence demonstrates that the Union met with the Employer and
resolved the Charging Party's grievances. While you may disagree with the ultimate
determination that the parties made, there is insufficient evidence that the Union's actions were
unlawfully motivated or otherwise violative of its duty of fair representation.

With respect to the conditional dismissal of the Section 8(b)(1)(A) allegation concerning
the Union's failure to provide a copy of the March 4, 2016 MOU on Wage Progression, the
evidence adduced by the investigation found there was arguable merit to this allegation.
However, the Acting Regional Director conditionally dismissal allegation as further proceedings
in this matter would not effectuate the purposes and policies of the Act. The Acting Regional
Director will hold the charge in abeyance for six months from the date of the Acting Regional
Director's letter, unless a meritorious change is filed within that time alleging that the Charged
Party had engaged in other unfair labor practices that render the decision inappropriate. At this
time, the Acting Regional Director's decision is appropriate in these circumstances.

With respect to the allegations of race discrimination, it should be noted that this Agency
does not regulate such allegations, but only allegations that fall under the Act and therefore, it is
recommended that the Charging Party contact the Equal Employment Opportunity Commission
(EEOC), which is the appropriate federal agency that handles such claims. The EEOC may be
reached by telephone toll free at 1-800-669-4000 or on the internet at www.eeoc.gov.

Inasmuch as it is argued that the Regional Office conducted an inadequate investigation, we conclude that the Regional Office conducted the investigation in accordance with the Agency's policies and procedures. Contrary to the contentions on appeal, all parties were given the opportunity to present their evidence and position on the case. The Acting Regional Director properly dismissed this case based on evidence and the case law.

For the above reasons, your appeal is denied.

Sincerely,

Peter Barr Robb
General Counsel

By:  _____
     Mark E. Arbesfeld, Director
     Office of Appeals

cc:   JENNIFER A. HADSALL              SHAWN LIGGONS
      ACTING REGIONAL DIRECTOR        6222 LEWIS AVE F
      NATIONAL LABOR RELATIONS        TOLEDO, OH 43612
       BOARD
      1240 E 9TH ST STE 1695
      CLEVELAND, OH 44199-2086

      DENNIS EARL, PRESIDENT          JAMES BAILEY, HR DIRECTOR
      UNITED AUTOMOBILE               GENERAL MOTORS
       WORKERS LOCAL 14               1455 W ALEXIS RD
      5411 JACKMAN RD                 TOLEDO, OH 43612-4004
      TOLEDO, OH 43613-2397

cl